**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

————————————————————————————

|  |  |  |
|---|---|---|
| BRIAN LAVIN, Derivatively on Behalf of TREEHOUSE FOODS, INC., | : | Case No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SAM K. REED, DENNIS F. RIORDAN, CHRISTOPHER D. SLIVA, GEORGE V. BAYLY, LINDA K. MASSMAN, DENNIS F. O'BRIEN, FRANK J. O'CONNELL, ANN M. SARDINI, GARY D. SMITH, TERDEMA L. USSERY, II, and DAVID B. VERMYLEN, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and, | : | |
| | : | |
| TREEHOUSE FOODS, INC., | : | |
| | : | |
| Nominal Defendant. | : | |

————————————————————————————:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Brian Lavin ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant TreeHouse Foods, Inc. ("TreeHouse" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Sam K. Reed, Dennis F. Riordan, Christopher D. Silva, George V. Bayly, Linda K. Massman, Dennis F. O'Brien, Frank J. O'Connell, Ann M. Sardini, Gary D. Smith, Terdema L. Ussery, and David B. Vermylen (the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of TreeHouse, unjust enrichment, waste of corporate assets, abuse of control, and gross

- 1 -

mismanagement. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TreeHouse, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of TreeHouse's directors and officers.

2.      TreeHouse is a company that manufactures and supplies private label food and beverage products and focuses on customer brands and custom products. The Company engages with retail grocery, food away from home, and industrial and export customers.

3.      To further their mission of being the leading supplier of private label food and beverage products, TreeHouse acquires other businesses and companies. One of these transactions includes the Company's acquisition of Ralcorp Holdings, Inc. from ConAgra Foods, Inc. (ConAgra's "Private Brands Business") to add to its own private label business. On February 1, 2016, TreeHouse announced that it had completed the acquisition of ConAgra Foods' private brands operations for $2.7 billion in cash plus transaction expenses.

4.    Between February 1, 2016 and the present (the "Relevant Period"), the investing public was under a false impression of the Company's financial performance.

5.    During the Relevant Period, the Company and the Individual Defendants intentionally and/or recklessly made materially false and misleading statements regarding the Company's business and operations.  Specifically, the Individual Defendants made and/or caused the Company to make false and/or misleading statements regarding: (1) the performance of the Company's private label business, (2) the Company's full-year 2016 guidance, and (3) the performance of the Company's ConAgra Private Brands Business acquisition strategy.

6.    On November 3, 2016, the Company filed a Current Report on Form 8-K with the SEC with accompanying press releases that announced that it had overstated its full-year 2016 guidance, its private brands business fell short of expectations, its acquisition strategy was underperforming, it was closing a facility in British Columbia, and its President was resigning.  On the same day, *The Wall Street Journal* published an article titled "TreeHouse Foods' Shares Fall Amid Executive Shuffle" that noted issues facing the Company.

7.    On November 2, 2016, the price of TreeHouse stock at the close of market was $86.59.  On November 3, 2016, the day after the November 2, 2016 press releases and *The Wall Street Journal* article, the price of TreeHouse stock at closing was $69.72.

8.    The Company's public statements during the Relevant Period were materially false and misleading at all relevant times, and caused an artificial inflation of TreeHouse's stock price.

9.    The Individual Defendants breached their fiduciary duties by permitting, facilitating, and causing the Company to make false and misleading statements and/or omissions of material fact and by permitting, facilitating, and causing the Company to fail to correct these

- 3 -

false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and two of the Individual Defendants to a securities class action in the United States District Court for the Northern District of Illinois (the "Securities Fraud Action"). Their breaches of fiduciary duty have subjected the Company to the need to undertake internal investigations and losses due to the unjust enrichment of Individual Defendants who received ill-gotten gains from insider sales, and will cost the Company going forward many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the substantial likelihood of the current directors' liability in this derivative action, and of their not being disinterested and/or independent directors, and of the engagement in insider selling by three Individual Defendants, a majority of the board of directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION

13.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or is an individual who is a citizen of Illinois or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

16.    Plaintiff is a current shareholder of TreeHouse common stock. Plaintiff has continuously held TreeHouse common stock at all relevant times.

### Nominal Defendant TreeHouse

17.    Defendant TreeHouse is a Delaware corporation that specializes in providing private label food and beverage offerings to retail grocery and food away from home customers across North America.  The Company maintains its principal executive offices at 2021 Spring Road, Suite 600, Oak Brook, Illinois 60523.  TreeHouse's registered agent/office is located in Cook County in Illinois.  TreeHouse has offices located in Cook County in Illinois.  TreeHouse's common stock is traded on The New York Stock Exchange ("NYSE") under the ticker symbol "THS."

### Defendant Reed

18.    Defendant Sam K. Reed ("Reed") has served as the Company's Chief Executive Officer and Chairman of the Board of Directors since January 2005 and, from July 2011 to August 2016, served as the Company's President.  According to the Company's Schedule 14A that was

filed with the SEC on March 2, 2016 (the "2016 Proxy Statement"), as of February 26, 2016, Defendant Reed beneficially owned 948,414 shares of the Company's common stock, which represented 1.7% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Reed owned over $75.8 million worth of TreeHouse stock.

19.     For the fiscal year ended December 31, 2015, Defendant Reed received $6,478,982 as compensation from the Company, which included $1,009,500 as base salary, $75,266 in non-equity incentive plan compensation, $3,349,570 in stock awards, $1,900,418 in option awards, and $144,228 in all other compensation.

20.     The Company's 2016 Proxy Statement stated the following about Defendant Reed:

> **SAM K. REED** is the Chairman of our Board. Mr. Reed has served as our Chairman and Chief Executive Officer since January 27, 2005 and as President since July 1, 2011. Prior to joining us, Mr. Reed was a principal in TreeHouse LLC, an entity unrelated to the Company that was formed to pursue investment opportunities in consumer packaged goods businesses. From March 2001 to April 2002, Mr. Reed served as Vice Chairman of Kellogg Company. From January 1996 to March 2001, Mr. Reed served as the President and Chief Executive Officer, and as a director of Keebler Foods Company. Prior to joining Keebler, Mr. Reed served as Chief Executive Officer of Specialty Foods Corporation's (unrelated to Dean Foods, as defined below) Western Bakery Group division from 1994 to 1995. Mr. Reed has also served as President and Chief Executive Officer of Mother's Cake and Cookie Co. and has held Executive Vice President positions at Wyndham Bakery Products and Murray Bakery Products. In addition to our Board, Mr. Reed has previously served on the boards of directors of Weight Watchers International, Inc. and Tractor Supply Company. Mr. Reed holds a B.A. from Rice University and an M.B.A. from Stanford University.
>
> We believe that as our Chairman and Chief Executive Officer, Mr. Reed has led a transformation of the Company focused on increasing value for customers and stockholders. With Mr. Reed's broad experience and deep understanding of the Company and the food

industry, and as Chief Executive Officer, he provides leadership and industry experience to the Board and to the Company.[1]

**Defendant Riordan**

21.     Defendant Dennis F. Riordan ("Riordan") has served as the Company's President since November 2016.  He previously served as the Company's Chief Financial Officer since January 2006 and, from July 2011 to November 2016, also served as the Company's Executive Vice President.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Riordan beneficially owned 182,259 shares of the Company's common stock, which represented 0.3% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Riordan owned over $14.5 million worth of TreeHouse stock.

22.     For the fiscal year ended December 31, 2015, Defendant Riordan received $1,980,330 as compensation from the Company, which included $525,667 as base salary, $27,434 in non-equity incentive plan compensation, $892,710 in stock awards, $506,837 in option awards, and $27,682 in all other compensation.

23.     The Company's 2016 Proxy Statement stated the following about Defendant Riordan:

> *Dennis F. Riordan* is our Executive Vice President and Chief Financial Officer. From January 3, 2006 to July 1, 2011 Mr. Riordan was Senior Vice President and Chief Financial Officer of the Company. Prior to joining us, Mr. Riordan was Senior Vice President and Chief Financial Officer of Océ-USA Holding, Inc., a manufacturer of printers and printing supplies and services, where he was responsible for the company's financial activities in North America. Mr. Riordan joined Océ-USA, Inc. in 1997 as Vice

---

[1] Emphasis in original unless otherwise stated.

- 7 -

President and Chief Financial Officer and was elevated to Chief Financial Officer of Océ-USA Holding, Inc. in 1999. In 2004, Mr. Riordan was named Senior Vice President and Chief Financial Officer and assumed the chairmanship of the company's wholly owned subsidiaries Arkwright, Inc. and Océ Mexico de S.A. Prior to his employment with Océ-USA, Mr. Riordan held positions with Sunbeam Corporation, Wilson Sporting Goods and Coopers & Lybrand. Mr. Riordan has also served on the boards of directors of Océ-USA Holdings, Océ North America, Océ Business Services, Inc. and Arkwright, Inc., all of which are wholly owned subsidiaries of Océ NV. Mr. Riordan is a Certified Public Accountant and holds a B.A. from Cleveland State University.

**Defendant Sliva**

24.     Defendant Christopher D. Sliva ("Sliva") served as the Company's President from August 2016 to November 3, 2016.  From July 2012 to August 2016, he served as the Company's Executive Vice President and Chief Operating Officer.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Sliva beneficially owned 56,583 shares of the Company's common stock, which represented 0.1% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Riordan owned over $4.5 million worth of TreeHouse stock.

25.     The Company's 2016 Proxy Statement stated the following about Defendant Sliva:

*Christopher D. Sliva* is our Executive Vice President of TreeHouse Foods, Inc. and our President of Bay Valley Foods, LLC ("Bay Valley Foods"). Prior to joining us, Mr. Sliva held various positions for Dean Foods from March 2006 to June 2012, including Chief Commercial Officer for the Fresh Dairy Direct Business from February 2011 to June 2012, and President and Chief Operating Officer of the Dean Foods subsidiary, Morningstar, from December 2007 to February 2011. From 2006 to 2007, Mr. Sliva served as Chief Customer Officer for WhiteWave Foods. Mr. Sliva held various positions for Eastman Kodak Company between March 2000 and February 2006, including Vice President and General

- 8 -

Manager, Consumer Printing from 2003 to 2006; Vice President of Sales, North American Consumer Division from 2001 to 2003; and, Vice President and General Manager, Kodak Retail Services from 2000 to 2001. Prior to his service at Eastman Kodak Company, Mr. Sliva held a variety of sales and marketing positions for Fort James Corporation from 1992 to 2000, and for Procter and Gamble Distributing Company from 1985 to 1992. Mr. Sliva holds a B.A. degree from Washington University.

26.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sliva made the following sale of Company stock (and made no purchases of company stock). On June 6, 2016, Defendant Sliva sold 3,093 shares of Company stock for $95.11 per share. Thus, before the fraud was exposed, he sold 3,093 Company shares on inside information, for which he received $294,175. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

**Defendant Bayly**

27.     Defendant George V. Bayly ("Bayly") has served as a Company Director since June 2005 and is Chairman of the Compensation Committee. According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Bayly beneficially owned 17,920 shares of the Company's common stock, which represented 0.03% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Bayly owned over $1.4 million worth of TreeHouse stock.

28.     For the fiscal year ended December 31, 2015, Defendant Bayly received $244,889 as compensation from the Company, which included $90,000 in fees earned or paid in cash and $154,889 in restricted stock units.

29.     The Company's 2016 Proxy Statement stated the following about Defendant Bayly:

> **GEORGE V. BAYLY** has served as a Director since June 2005. Mr. Bayly currently serves as principal of Whitehall Investors, LLC, a consulting and venture capital firm, having served in that role since August 2008. Mr. Bayly served as Chairman and Chief Executive Officer of Altivity Packaging LLC, a maker of consumer packaging products and services, from September 2006 to March 2008. He also served as CEO and Co-Chairman of U.S. Can Corporation from 2003 to 2006 and Chief Executive Officer in 2005. In addition, from January 1991 to December 2002, Mr. Bayly served as Chairman, President and Chief Executive Officer of Ivex Packaging Corporation. From 1987 to 1991, Mr. Bayly served as Chairman, President and Chief Executive Officer of Olympic Packaging, Inc. Mr. Bayly also held various management positions with Packaging Corporation of America from 1973 to 1987. Prior to joining Packaging Corporation of America, Mr. Bayly served as a Lieutenant Commander in the United States Navy. In addition to our Board, Mr. Bayly currently serves on the board of directors of ACCO Brands Corporation, Multi-Packaging Solutions Limited and Miami University's Farmel School of Business and is a member of a five-person (5) roundtable at Madison Dearborn Partners. Mr. Bayly formerly served on the boards of directors of Huhtamaki Oyj, General Binding Corporation, Packaging Dynamics, Inc., U.S. Can Corporation, Ryt-Way Industries, Inc. Altivity Packaging LLC and Graphic Packaging Holding Company. Mr. Bayly holds a B.S. from Miami University and an M.B.A from Northwestern University. Mr. Bayly is Chairman of the Compensation Committee of our Board.
>
> As a former executive of numerous large companies and a principal of a consulting and venture capital firm, Mr. Bayly has a broad understanding of the operational, financial and strategic issues facing public and private companies. This experience gives him valuable knowledge and perspective as Chairman of the Compensation Committee.

**Defendant Massman**

30.     Defendant Linda K. Massman ("Massman") has served as a Company Director since July 2016 and is a member of the Audit Committee.

31.     The Company's website, www.treehousefoods.com, states the following about Defendant Massman:

> Linda K. Massman, 50, was elected to the TreeHouse Board of Directors on July 28, 2016. Ms. Massman serves as the President and Chief Executive Officer of Clearwater Paper Corporation where she has been in position since 2013. Previously, Ms. Massman served as the company's President and Chief Operating Officer from 2011-2013. Prior to that, Ms. Massman server as the company's Chief Financial Officer from 2008 to 2011. Before joining Clearwater Paper, Ms. Massman served as group vice president of finance and corporate planning for SUPERVALUE Inc., following its acquisition of Albertson's Inc, where she served in a similar capacity. Prior to that, Ms. Massman was a business strategy consultant for Accenture. Ms. Massman serves on the Board of Directors of Clearwater Paper Corporation and Black Hills Corporation. In 2016, she was elected as the first vice chairwoman for the American Forest & Paper Association. She earned her Bachelor of Business Administration in finance from the University of North Dakota and holds an MBA from Harvard Business School. Ms. Massman is a member of the Audit Committee of our Board of Directors.

**Defendant O'Brien**

32.     Defendant Dennis F. O'Brien ("O'Brien") has served as a Company Director since August 2009 and is Chairman of the Nominating and Corporate Governance Committee and a member of the Audit Committee.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant O'Brien beneficially owned 13,620 shares of the Company's common stock, which represented 0.02% of the Company's outstanding shares.  Given that the price per share of

the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, O'Brien owned over $1 million worth of TreeHouse stock.

33.     For the fiscal year ended December 31, 2015, Defendant O'Brien received $252,389 as compensation from the Company, which included $97,500 in fees earned or paid in cash and $154,889 in restricted stock units.

34.     The Company's 2016 Proxy Statement stated the following about Defendant O'Brien:

> **DENNIS F. O'BRIEN** has served as a Director since August 2009. Mr. O'Brien is a partner of Gryphon Investors, Inc., a private equity firm, a position he has held since April 2008. Prior to joining Gryphon, Mr. O'Brien was the Chief Executive Officer of Penta Water Company, a maker of bottled water, from April 2007 to April 2008. On October 5, 2009, Penta Water Company, Inc. filed for bankruptcy under Chapter 11. Mr. O'Brien held a series of executive positions with ConAgra Foods, Inc., including President and Chief Operating Officer, Retail Products from 2004 to 2006, President and Chief Operating Officer, Grocery Foods from 2002 through 2004, Executive Vice President, Grocery Foods from 2001 to 2002 and President, ConAgra Store Brands from 2000 through 2001. In addition, Mr. O'Brien previously held executive and marketing positions at Armstrong World Industries, Campbell's Soup Company, Nestle S.A. and Procter & Gamble. Mr. O'Brien holds a Bachelor of Science degree in marketing from the University of Connecticut. Mr. O'Brien previously sat on the audit committee of Senomyx, Inc.. Mr. O'Brien is a member of the Audit Committee and Chairman of the Nominating and Corporate Governance Committee of our Board.
>
> Mr. O'Brien provides insight and perspective on strategic, marketing and food industry matters stemming in part from his significant food industry experience.

**Defendant O'Connell**

35.     Defendant Frank J. O'Connell ("O'Connell") has served as a Company Director since June 2005 and is Chairman of the Audit Committee. According to the 2016 Proxy Statement,

as of February 26, 2016, Defendant O'Connell beneficially owned 24,420 shares of the Company's common stock, which represented 0.04% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, O'Connell owned over $1.9 million worth of TreeHouse stock.

36.    For the fiscal year ended December 31, 2015, Defendant O'Connell received $247,389 as compensation from the Company, which included $92,500 in fees earned or paid in cash and $154,889 in restricted stock units.

37.    The Company's 2016 Proxy Statement stated the following about Defendant O'Connell:

> **FRANK J. O'CONNELL** has served as a Director since June 2005. Mr. O'Connell currently serves as the General Partner of the Quincy Investment Pools LP, is a co-founder of Tuckerman Capital, a Private Equity firm, and serves on the board of Orthofeet, a portfolio company. Mr. O'Connell previously served as a senior partner of The Parthenon Group from June 2004 until May 2012. From November 2000 to June 2002, Mr. O'Connell served as President and Chief Executive Officer of Indian Motorcycle Corporation. From June 2002 to May 2004, Mr. O'Connell served as Chairman of Indian Motorcycle Corporation. Prior to Indian Motorcycle Corporation, from 1996 to 2000, Mr. O'Connell served as Chairman, President and Chief Executive Officer of Gibson Greetings, Inc. From 1991 to 1995, Mr. O'Connell served as President and Chief Operating Officer of Skybox International. Mr. O'Connell has previously served as President of Reebok Brands, North America, President of HBO Video and Senior Vice President of Mattel's Electronics Division. Mr. O'Connell is the Non-Executive Chairman of Schylling Inc., a private company and is on the board of King Arthur Flour, an employee-owned corporation. Mr. O'Connell holds a B.A. and an M.B.A. from Cornell University. Mr. O'Connell is Chairman of the Audit Committee of our Board.

- 13 -

As an experienced financial and operational leader with companies in a variety of industries, Mr. O'Connell brings a broad understanding of the operating priorities across diverse industries while having an in-depth knowledge of the food industry to the board. Mr. O'Connell brings to the board a focus on shifting consumer behavior and its impact on product development. Mr. O'Connell's experience leading organic and acquisition growth initiatives and as a strategic consultant to many companies has contributed significantly to our acquisition approach and extensive due diligence of food industry sectors and target companies.

**Defendant Sardini**

38.    Defendant Ann M. Sardini ("Sardini") has served as a Company Director since May 2008 and is the Lead Independent Director and a member of the Compensation Committee. According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Sardini beneficially owned 11,410 shares of the Company's common stock, which represented 0.02% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Sardini owned over $912,115 worth of TreeHouse stock.

39.    For the fiscal year ended December 31, 2015, Defendant Sardini received $254,889 as compensation from the Company, which included $100,000 in fees earned or paid in cash and $154,889 in restricted stock units.

40.    The Company's 2016 Proxy Statement stated the following about Defendant Sardini:

ANN M. SARDINI has served as a Director since May 2008. Ms. Sardini is currently an independent advisor and consultant to early and mid-stage companies and private equity firms. From April 2001 to June 2012, when she retired from that position, Ms. Sardini served as the Chief Financial Officer of Weight Watchers International, Inc. She served as Chief Financial Officer of Vitamin Shoppe.com, Inc., a seller of vitamins and nutritional supplements, from

- 14 -

September 1999 to December 2001, and from March 1995 to August 1999 she served as Executive Vice President and Chief Financial Officer for the Children's Television Workshop. In addition, Ms. Sardini has held finance positions at QVC, Inc., Chris Craft Industries, and the National Broadcasting Company. In addition to our Board, Ms. Sardini has served on the board of directors of Pier 1 Imports, Inc. since 2013 and currently chairs its Audit Committee, and since 2016, on the board of directors of Ideal Protein. In addition, Ms. Sardini currently serves since 2013 on the advisory board of LearnVest.com. Previously, Ms. Sardini has served on the boards of directors for Promise Project Fund for the City of New York from 2012 to 2015, Weight Watchers Danone China Ltd. from 2008 to 2010 and Veneca Inc. from 2005 to 2007. Ms. Sardini holds a B.A. from Boston College and an M.B.A from Simmons College Graduate School of Management. Ms. Sardini is our Lead Independent Director and a member of the Compensation Committee of our Board.

Ms. Sardini is a financial expert and transformation leader with over twenty (20) years of experience in senior financial management positions in branded media and consumer products companies, ranging in scope from multi-national to early stage start-up companies. She currently consults with companies and investors on business, strategic and operational matters. She provides independent guidance to the Board on a wide variety of general corporate and strategic matters based on her extensive executive experience, her financial experience as chief financial officer of a public company, and her broad operating business background.

41. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sardini made the following sale of Company stock (and made no purchases of company stock). On June 29, 2016, Defendant Sardini sold 3,830 shares of Company stock for $98.77 per share. Thus, before the fraud was exposed, she sold 3,830 Company shares on inside information, for which she received $378,289.10. Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the fraud.

- 15 -

**Defendant Smith**

42.     Defendant Gary D. Smith ("Smith") has served as a Company Director since June 2005 and is a member of both the Audit Committee and Nominating and Corporate Governance Committee.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Smith beneficially owned 24,735 shares of the Company's common stock, which represented 0.04% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Smith owned over $1.9 million worth of TreeHouse stock.

43.     For the fiscal year ended December 31, 2015, Defendant Smith received $242,389 as compensation from the Company, which included $87,500 in fees earned or paid in cash and $154,889 in restricted stock units.

44.     The Company's 2016 Proxy Statement stated the following about Defendant Smith:

> **GARY D. SMITH** has served as a Director since June 2005. Mr. Smith is Chairman of Encore Associates, Inc., a consulting firm specializing in serving the national food and retail goods sectors, a position he has held since January 2001. Since 2005, he has been a Founding Managing Director of Encore Consumer Capital. From April 1995 to December 2004, Mr. Smith served as Senior Vice President — Marketing of Safeway Inc. In addition, Mr. Smith held various management positions at Safeway Inc. from 1961 to 1995. In addition to our Board, Mr. Smith currently serves on or has previously served on the boards of directors of AgriWise, Inc., Altierre Corporation, Philly's Famous Water Ice, Inc., the Winery Exchange, Inc., FreshKO Produce Services, Inc., Aidell's Sausage Company, Inc., Mesa Foods, Inc., Brownie Brittle, LLC and Fantasy Cookie Company.
>
> Mr. Smith is an experienced business leader with skills that make him a valuable asset in his role as a member of the Audit and Nominating and Corporate Governance Committees of our Board. Mr. Smith's deep understanding of the grocery channel and

experience as an acquirer and investor in businesses adds significantly to acquisitions and customer insight.

45.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Smith made the following sale of Company stock (and made no purchases of company stock).  On March 31, 2016, Defendant Smith sold 7,015 shares of Company stock for $87.00 per share. Thus, before the fraud was exposed, he sold 7,015 Company shares on inside information, for which he received $610,305.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

**Defendant Ussery**

46.     Defendant Terdema L. Ussery ("Ussery") has served as a Company Director since June 2005 and is a member of both the Audit Committee and Nominating and Corporate Governance Committee.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Ussery beneficially owned 25,920 shares of the Company's common stock, which represented 0.05% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Ussery owned over $2 million worth of TreeHouse stock.

47.     For the fiscal year ended December 31, 2015, Defendant Ussery received $242,389 as compensation from the Company, which included $87,500 in fees earned or paid in cash and $154,889 in restricted stock units.

48.     The Company's 2016 Proxy Statement stated the following about Defendant Ussery:

- 17 -

**TERDEMA L. USSERY** has served as a Director since June 2005. Mr. Ussery was President and Chief Executive Officer of the Dallas Mavericks, a professional basketball team, a position he held from April 1997 to September, 2015, when he left to join Under Armour for a brief stint as President of Global Sports Categories. From September 2001 through June 2012, Mr. Ussery served as Chief Executive Officer of HDNet, a provider of high definition television programming. From 1993 to 1996, Mr. Ussery served as the President of Nike Sports Management. From 1991 to 1993, Mr. Ussery served as Commissioner of the Continental Basketball Association (the "CBA"). Prior to becoming Commissioner, Mr. Ussery served as Deputy Commissioner and General Counsel of the CBA from 1990 to 1991. From 1987 to 1990, Mr. Ussery was an attorney at Morrison & Foerster LLP. In addition to our Board, Mr. Ussery currently serves on, or has previously served on, the boards of directors of The Timberland Company and Entrust, Inc. He also serves on the Advisory Board of Wingate Partners, LP and as Chairman of the Board of Commissioners of the Dallas Housing Authority. Mr. Ussery holds a B.A. from Princeton University, an M.P.A. from Harvard University, a J.D. from the University of California at Berkeley, and an M.A.R. from Yale University. Mr. Ussery is a member of the Nominating and Corporate Governance Committee and Audit Committee of our Board.

As the former President and CEO of the Dallas Mavericks and former CEO of HDNet, Mr. Ussery brings operating, management experience, leadership capabilities, financial knowledge and business acumen to the Board. Mr. Ussery's experience on other boards adds significantly to governance, compensation and public relations matters.

**<u>Defendant Vermylen</u>**

49.     Defendant Vermylen ("Vermylen") has served as a Company Director since August 2009.  According to the 2016 Proxy Statement, as of February 26, 2016, Defendant Vermylen beneficially owned 223,321 shares of the Company's common stock, which represented 0.4% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on February 1, 2016, the beginning of the Relevant Period, was $79.94, Vermylen owned over $17.8 million worth of TreeHouse stock.

50. For the fiscal year ended December 31, 2015, Defendant Vermylen received $529,889 as compensation from the Company, which included $375,000 in fees earned or paid in cash and $154,889 in restricted stock units.

51. The Company's 2016 Proxy Statement stated the following about Defendant Vermylen:

> **DAVID B. VERMYLEN** has served as a Director since August 2009. Mr. Vermylen has been a Senior Advisor to TreeHouse since July 1, 2011. Mr. Vermylen held the positions of President and Chief Operating Officer for TreeHouse, from January 2005 to July 2011. Prior to joining us, Mr. Vermylen was a principal in TreeHouse, LLC, an entity unrelated to the Company that was formed to pursue investment opportunities in consumer packaged goods businesses. From March 2001 to October 2002, Mr. Vermylen served as President and Chief Executive Officer of Keebler Foods, a division of Kellogg Company. Prior to becoming Chief Executive Officer of Keebler, Mr. Vermylen served as the President of Keebler Brands from January 1996 to February 2001. Mr. Vermylen served as the Chairman, President and Chief Executive Officer of Brother's Gourmet Coffee, and Vice President of Marketing and Development and later President and Chief Executive Officer of Mother's Cake and Cookie Co. His prior experience also includes three (3) years with the Fobes Group and fourteen (14) years with General Foods Corporation where he served in various marketing positions. In addition to our Board, Mr. Vermylen currently serves on or has previously served on the boards of directors of Aeropostale, Inc., Birds Eye Foods, Inc. and Brownie Brittle LLC. Mr. Vermylen holds a B.A. from Georgetown University and an M.B.A. from New York University.
>
> Mr. Vermylen has a deep understanding of the Company, and he brings insight and knowledge from his executive experience at other companies in the food industry and service on public company boards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52. By reason of their positions as officers, directors and/or fiduciaries of TreeHouse and because of their ability to control the business and corporate affairs of TreeHouse, the

Individual Defendants owed TreeHouse and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage TreeHouse in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of TreeHouse and its shareholders so as to benefit all shareholders equally.

53. Each director and officer of the Company owes to TreeHouse and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54. The Individual Defendants, because of their positions of control and authority as directors and/or officers of TreeHouse, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55. To discharge their duties, the officers and directors of TreeHouse were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of TreeHouse, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised TreeHouse's Board at all relevant times.

57. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including omission of the facts that the Company's private label business was underperforming, the Company had overstated its 2016 guidance, and the Company's acquisition strategy was underperforming. The Company also had a duty to cause the Company to disclose these omissions in its regulatory filings with the SEC, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58. To discharge their duties, the officers and directors of TreeHouse were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of TreeHouse were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to TreeHouse's own internal guidelines;

- 21 -

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how TreeHouse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of TreeHouse and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that TreeHouse's operations would comply with all laws and TreeHouse's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

59.     Each of the Individual Defendants further owed to TreeHouse and the shareholders the duty of loyalty requiring that each favor TreeHouse's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of TreeHouse and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with TreeHouse, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by TreeHouse.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of TreeHouse was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of TreeHouse, and was at all times acting within the course and scope of such agency.

### Code of Ethics

68.     The Company's corporate Code of Ethics (the "Code of Ethics") that is available on its website, www.treehousefoods.com, governs the conduct of all of the Company's officers, directors, and employees and instructs their "unwavering commitment to: act with integrity and honesty; Obey all laws and regulations applicable to our business; and Comply with the Company's Code of Ethics."

69.     The Code of Ethics itself states, in pertinent part:

**E: Our Responsibilities to our Shareholders**

**Accounting and Other Record Keeping**

Our policy is to maintain accurate and complete Company records at all times. If you are a record keeper of any kind, you must never misrepresent facts or falsify records.

If you are involved in any way in the preparation of our financial statements, you must ensure that all financial transactions are recorded in accordance with generally accepted accounting principles and you must comply with our established system of internal controls at all times. We have established accounting policies and procedures that are accessible to all employees involved in the preparation of our financial statements. All such employees must comply with those policies and procedures at all times. We are committed to providing our investors with accurate, complete and transparent financial information and all employees involved in recording our financial transactions are expected always to act in accordance with that objective. No accounting entry should ever be made that disguises the true nature of any transaction. All information provided to auditors, both internal and external, must be complete and accurate and we require that you cooperate fully with our auditors in providing them any information they may request. Any confirmation requests received from the auditors of any of our customers or vendors must be forwarded to the appropriate accounting personnel. For more information about where to forward audit confirmation requests from our business partners, see "Contact Information" at the back of this booklet. If you are an accounting employee responsible for responding to audit confirmations from our business partners,

you must always ensure that our responses are accurate and complete.

From time to time, we enter into written agreements with suppliers, vendors, customers and other business partners. In order to ensure that our financial statements accurately reflect our business agreements, all written agreements must always fully and accurately reflect the terms of the business arrangement. You must never enter into or issue any "side letter" or make any representation that is inconsistent with the actual business arrangement. You must never knowingly take any action intended to allow one of our business partners to improperly characterize or account for a business transaction.

In our manufacturing operations, we maintain many types of important records in addition to financial records, such as service reports, production and maintenance logs, safety records, laboratory reports, shipping and receiving records and reports prepared for governmental agencies. Also, many employees submit time records or written expense reports. All such records must always be prepared in an accurate, honest and timely manner.

**Compliance with Laws**

It is our policy to fully comply with all laws applicable to our Company in the places where we conduct business. We expect you to be informed about the laws that are applicable to your role in our organization. You must never knowingly take any action that violates the law or that would enable another person or entity (such as a customer or Supplier) to violate the law. Remember that violations of law can carry substantial criminal and civil penalties for both our Company and for the individual(s) who caused or allowed such violation.

. . .

**Securities Trades**

If you possess any material information about our Company that we have not yet disseminated to the public, you must not:
- Buy or sell our stock,
- Pass such information on to anyone else (even to other employees, unless they have a business need to know), or
- Engage in any other action to take advantage of that non-public material information.

"Material" information includes any information that an investor would consider important in deciding whether to buy or sell our stock. Either positive or negative information can be "material." Examples of information that you might possess that

would be considered to be "material" under the securities laws are:

- Our quarterly or annual financial or operating results,
- A significant acquisition or sale of assets or divestiture of a major subsidiary,
- A pending or proposed merger or tender offer,
- A significant change in management,
- A significant new product or technology,
- Declaration of a stock split or the offering of additional securities, or
- A threatened or pending claim against, or investigation involving, our Company (including product liability claims).

The restrictions of this policy also apply to your family members and others living in your household. You are responsible for the compliance of such persons with the securities laws.

Even the appearance of an improper transaction must be avoided. Accordingly, even if you believe that you do not possess non-public material information about our Company, you should never make a recommendation to anyone to buy, sell or hold our stock. Further, anytime we issue a press release announcing a material event (such as our quarterly press release regarding our financial results) you must wait until the second business day after such release to buy or sell our stock. Officers, Directors and certain key employees will be subject to occasional "black-out" periods during which no purchases or sales of our stock may be executed (with certain limited exceptions). If you are an Officer or Director, you must pre- clear any purchase or sale of our stock with our Law Department in order to ensure that a trading "black-out" is not in effect.

**Conflicts of Interest**

You must always discharge your job responsibilities solely on the basis of the Company's best interests, independent of any personal considerations or relationships. Therefore, you must avoid any financial interest or other business relationship (such as with a competitor, supplier or customer of our Company) that might interfere with your effective job performance or be adverse to the interests of our Company, except for any investment in an insignificant amount of securities issued by a publicly-traded company or an investment or relationship that is approved as described below. It is our policy that you should avoid any financial or other business relationships that would create even the appearance of conflicting loyalties or interests.

In all dealings with vendors, you must never request or accept any payment or other significant things of value that would have the apparent or potential purpose or result of influencing your business decisions. Unless your supervisor otherwise approves in advance, you may not accept gifts or entertainment from vendors unless:

- The gift or entertainment is of nominal value and in a form that it could not be construed as a bribe or payoff,

- Giving and accepting the gift or entertainment is consistent with accepted ethical customs and practices, and
- Disclosure of the gift or entertainment to our shareholders, the public and your fellow employees would not embarrass our Company or you.

If you have any interest or relationship with a Supplier, competitor, customer or other entity that might appear to compromise your duty of loyalty to our Company, to impair your ability to objectively act in the best interest of our Company, or to pose any other sort of conflict of interest, you must bring it to our attention immediately. If you are an Executive Officer or Director of TreeHouse Foods, Inc., you must report the conflict or potential conflict to our Law Department so that the conflict can be considered by the Nominating and Corporate Governance Committee of our Board of Directors. If you are not an Executive Officer or Director, you must report an actual or potential conflict of interest to your supervisor for consideration. Any such conflict or potential conflict will only be approved if it is determined that it will not materially impair your ability to perform your duties in the best interests of the Company.

. . .

## Protection of Company Assets

You are expected to use your best efforts to protect the value of our Company assets, both tangible and intangible.

All equipment, supplies, software and other tangible assets used in our business must be treated with care. You are responsible for ensuring that all equipment issued to you is properly used, stored and maintained. Unauthorized use of Company equipment, supplies, software or other assets (including any use that is in violation of this Code) is prohibited. You must never make unauthorized copies of any Company software or remove any Company equipment or other assets from our premises without specific authorization.

Remember that our intangible assets are just as valuable as our tangible assets. You must maintain the confidentiality of non-public information about our Company. Confidential information is any information of a confidential, proprietary or secret nature related to our business. It includes, among other things, confidential business processes, practices or results of operations, trade secrets, formulas, manufacturing techniques, research and development information, business plans or forecasts (including plans with respect to proposed acquisitions of other companies or their assets), customer lists or other sales data, personnel information, marketing plans and information concerning any pending or threatened litigation or claims against our Company. We also expect you to protect the confidentiality of any such information we may have about our customers, business partners, suppliers, distributors and others with whom we do business or with whom we have signed a confidentiality agreement.

You must never disclose confidential information to outsiders (including customers, suppliers or press representatives or on Internet message boards or other social media) or even to other employees whose duties do not require them to have the information. You should use extreme caution when using email or social media to transmit information which may contain our Company trade secrets, business plans or any other confidential or proprietary information since email messages and social media can easily be forwarded to or viewed by other individuals.

Finally, you must not use confidential business information to advance your personal interests (or that of any third party) through investment activities or otherwise.

This provision and the Code generally are not intended, and should not be interpreted, to preclude or dissuade employees from engaging in any activities protected by state or federal law, including the National Labor Relations Act, such as discussing wages, benefits or terms and conditions of employment, forming, joining or supporting labor unions, bargaining collectively through representatives of their choosing, raising complaints about working conditions for their and their fellow employees' mutual aid or protection.

Pursuant to its obligations as a federal contractor, the Company will not discharge or in any other manner discriminate against employees or applicants because they have inquired about, discussed, or disclosed their own pay or the pay of another employee or applicant. However, employees who have access to the compensation information of other employees or applicants as a part of their essential job functions cannot disclose the pay of other employees or applicants to individuals who do not otherwise have access to compensation information, unless the disclosure is (a) in response to a formal complaint or charge, (b) in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or (c) consistent with the contractor's legal duty to furnish information.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **February 1, 2016 Form 8-K**

70.     On  February 1, 2016, the Company filed a Current Report on Form 8-K with the SEC with an accompanying press release attached as Exhibit 99.1.  The Form 8-K was signed by Thomas E. O'Neill ("O'Neill"), the Company's General Counsel, Executive Vice President.

71.     In its press release, the Company announced "TreeHouse Foods Completes the Acquisition of ConAgra's Private Brands Business."  It stated, in relevant part, that the Company

had "today . . . completed the acquisition of ConAgra Foods' private brands operations." It also stated:

> TreeHouse paid $2.7 billion in cash plus transaction expenses for the business and financed the transaction through the closing of its previously announced offerings of $775 million in aggregate principal senior notes due 2024 with a 6.0% annual interest rate and common stock issuance of 13.3 million shares at a price of $65 per share (which includes the exercise, in full, of the overallotment option), aggregating $862.5 million in gross proceeds [and] [t]he remainder of the purchase price was financed under the Company's revolving credit facility.

72.     Defendant Reed stated in the press release:

> We are pleased to have closed the acquisition, and will continue to focus on driving shareholder value and offering our customers value without compromise through economies of scale, quality products and superior customer service. The Private Brands acquisition broadens our portfolio of offerings for our customers. We remain unwaveringly committed to supporting our customers' efforts to build their corporate brands and offer consumers the best combination of choice and value. We are looking forward to working as one go-to-market team to achieve success and will work tirelessly to develop the systems and infrastructure to deliver a seamless integration.

73.     The press release additionally stated:

> The acquisition of ConAgra's private brands operations meaningfully expands TreeHouse's presence in private label dry and refrigerated grocery, and will be called TreeHouse Private Brands. Bay Valley Foods (with Flagstone Foods) and TreeHouse Private Brands will be the operating platforms of TreeHouse Foods, Inc. Following the Private Brands acquisition, TreeHouse Foods, Inc. has pro forma sales of approximately $7 billion for the twelve months ended December 31, 2015, more than 50 manufacturing facilities and over 16,000 employees.

**February 11, 2016 Form 8-K**

74.     On February 11, 2016, the Company filed a Current Report on Form 8-K with the SEC with an accompanying press release attached as Exhibit 99.1. The Form 8-K was signed by O'Neill.

75.     In its press release, the Company highlighted: "TreeHouse delivered fourth quarter adjusted earnings per share of $1.08, a 9.1% increase from 2014; Net sales in the fourth quarter

were $865.4 million; Fourth quarter adjusted EBITDA increased 2.3% from 2014 due to strong operating performance; and TreeHouse reiterates full year 2016 earnings per share guidance of $2.95 to $3.10."

76.     The press release also noted: "TreeHouse Foods, Inc. (NYSE: THS) today reported fourth quarter earnings of $0.85 per fully diluted share compared to $0.78 per fully diluted share reported for the fourth quarter of last year.  The Company reported adjusted earnings per share in the fourth quarter of $1.08 compared to $0.99 in the fourth quarter of the prior year . . . ."

77.     Defendant Reed provided the following commentary: "We finished the year strong, and our employees deserve a great deal of credit for continuing to focus on improving our operations and driving excellent margin progress.  While overall market conditions remained soft and weakness in the Canadian dollar persisted, both of which weighed on our top line, we are very proud to have delivered margin expansion of 150 basis points in the fourth quarter."  He also commented on the Company's outlook:

> This year marks the beginning of an important journey for us, as we press forward with our strategic vision and relentlessly focus on tactical execution.  We remain fully committed to growth and simplification, and believe that our greatest opportunities continue to lie ahead.  We remain dedicated to building a private label platform that offers a broad portfolio of products that are important to our customers and supports their efforts to build their corporate brands, while offering consumers the best combination of choice and value.

78.     The press release additionally noted improved margins.  It stated: "Adjusted EBITDA . . . was $120.2 million in the fourth quarter of 2015, a 2.3% increase compared to the same period in the prior year.  Adjusted EBITDA was higher this quarter due to improved margins across our business from strong operating performance and favorable commodity costs, more than offsetting the impact of lower sales and unfavorable Canadian foreign exchange."

- 31 -

79.     Notably, the press release stated that "TreeHouse net sales are expected to double in 2016 to approximately $6.3-6.5 billion, driven by the addition of the Private Brands Business" and the Company "expects the Canadian exchange rate in 2016 to be approximately $0.72 for the year [which] represents an approximate $0.09 headwind to full year earnings per share."

**February 18, 2016 Form 10-K**

80.     On February 18, 2016, the Company filed their Annual Report for the fiscal year ended December 31, 2015 on Form 10-K with the SEC ("2015 10-K"), which was signed by Defendants Reed, Riordan, Bayly, O'Brien, O'Connell, Sardini, Smith, Ussery, and Vermylen.  In it, the Company reported net earnings per basic share of $2.67 on net sales of $3.2 billion.

81.     The 2015 10-K also noted:

According to independent market research studies, private label grocery products have increased their market share in the United States from 12.7% in 1989 to approximately 17.8% in 2015.  Despite gains in market share, private label penetration in the United States remains below that of many other developed economies, including France (27%), Spain (42%), Germany (35%), the United Kingdom (41%) and Switzerland (45%) (market research estimates based on 2014 data).  Over time, we expect private label market share in the United States will approach the levels currently present in Europe, but due to structural differences, we do not anticipate this in the short term.  In 2015, based on available industry data, private label products sold in the retail grocery channel in the United States compete with branded products on the basis of equivalent quality at a lower price.

82.     The 2015 10-K specifically outlined Company plans and delivered expectations:

Our strategy is to be the leading supplier of private label food and beverage products by providing the best balance of quality and cost to our customers. We intend to grow our business and enhance profitability and customer relationships through the following strategic initiatives:

- *Expand partnerships with retailers.* As grocery retailers become more demanding of their private label food product suppliers, they have come to expect strategic insight, product innovation, customer service, and logistical economies of scale similar to those of our branded competitors. To this end, we are continually developing, investing in, and expanding our private label food product offerings

and capabilities in these areas. In addition to our low cost manufacturing, we have invested in research and development, product and packaging innovation, category management, information technology systems, and other capabilities. We believe that these investments enable us to provide a broad and growing array of private label food products that generally meet or exceed the value and quality of branded competitors that have comparable sales, marketing, innovation, and category management support. We believe that we are well positioned to expand our sales with grocery retailers given our differentiated capabilities, breadth of product offerings, and geographic reach.

- *Utilize our scale and innovation to meet customer needs.* The U.S. retail food industry has continued to bifurcate from traditional food retailers (those who carry a full array of refrigerated, frozen, and shelf stable products) to specialty retailers who cater to consumers who migrate to either end of the value spectrum. These specialty retailers tend to focus on either value offerings for consumers looking for the maximum value of their food purchases, or catering to consumers looking for the highest quality ingredients, unique packaging, or products to satisfy particular dietary needs. Also impacting the food industry is a noticeable increase in consumers that are snacking more frequently and that seek "healthy" and "better for you" foods, that include items such as fresh or freshly prepared foods, natural, organic, or specialty foods. We offer a variety of innovative products and flavor profiles in a comprehensive offering of packaging formats that include natural, organic and preservative free ingredients, that we believe meet the "good, better, and best" needs of both traditional grocers and specialty retailers.

- *Drive growth and profitability from our existing product portfolio*. We believe we can drive organic growth from our existing product portfolio. Through insights gained from our portfolio strategy, we develop operating strategies that enable us to focus our resources and investments on products and categories that we believe offer the highest potential. Additionally, our analyses identify products and categories that lag the broader portfolio and require corrective action. We believe our portfolio strategy maximizes the full potential of all of our product offerings.

- *Leverage cross-selling opportunities across customers, sales channels and geographies*. We are a leading manufacturer of private label food products in the United States, primarily in non-dairy powdered creamer, salad dressing, powdered drink mixes, instant hot cereals, trail mixes, and pickles. However, we believe we still have significant potential for growth with grocery retailers and foodservice distributors that we currently serve in a limited manner, or that do not carry all of the products we offer. We believe that certain customers view our size and scale as an advantage over smaller private label food product producers, many of whom provide only a single category or service to a single customer or geography. Our ability to service customers across North America and across a wider spectrum of

- 33 -

products and capabilities provides many opportunities for cross-selling to customers who seek to reduce the number of private label food product suppliers they utilize.

- *Growth through acquisitions*. We believe we have the expertise and demonstrated ability to identify and integrate value-enhancing acquisitions. We selectively pursue acquisitions of complementary businesses that we believe are a compelling strategic fit with our existing operations and will increase shareholder value. Each potential acquisition is evaluated for merit utilizing a rigorous analysis that assesses targets for their market attractiveness, intrinsic value, and strategic fit. We believe our acquisitions have been successful and consistent with our strategy. Since we began operating as an independent company in 2005, our acquisitions have significantly added to our revenue base and allowed us to significantly diversify our product offerings. We attempt to maintain conservative financial policies when pursuing acquisitions and we believe that our proven integration strategies have resulted in deleveraging. By identifying targets that fit within our defined strategies, we believe we can continue to expand our product selection and continue our efforts to be the low-cost, high quality and innovative supplier of private label food products for our customers. During 2014, we completed our most recent acquisitions of PFF Capital Group ("Protenergy") for approximately $143 million and Flagstone for approximately $855 million. On February 1, 2016, we completed the acquisition of the Private Brands Business from ConAgra Foods for $2.7 billion, subject to working capital and other adjustments.

83.    Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Reed and Riordan attesting to the accuracy of the 2015 10-K.

**May 5, 2016 Form 8-K and Form 10-Q**

84.    On May 5, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC ("1Q 2016 10-Q") and a Current Report Form 8-K with an accompanying press release attached as Exhibit 99.1.  The Form 8-K was signed by O'Neill, and the Form 10-Q was signed by Defendant Riordan.

85.    In the press release, the Company announced financial results for the fiscal quarter ended March 31, 2016 and highlighted:

TreeHouse delivered a first quarter GAAP (generally accepted accounting principles in the United States) loss per share of $0.06 and adjusted earnings per share of $0.48; Net sales in the first quarter were $1.3 billion, a 62.2% increase from 2015, driven by the Private Brands acquisition; First quarter adjusted EBITDA increased to $125.2 million, up 48.2% from 2015, driven by the Private Brands acquisition; The Company provides second quarter 2016 adjusted earnings per share guidance range of $0.50 to $0.55; TreeHouse tightens full year 2016 adjusted earnings per share guidance range to $3.00 to $3.10.

86.     The press release noted:

TreeHouse . . . today reported a first quarter GAAP loss of $0.06 per fully diluted share compared to earnings of $0.41 per fully diluted share reported for the first quarter of last year. . . . The Company's 2016 first quarter results included four items . . . that, in management's judgment, affect the assessment of earnings. The first item was a $0.51 per share expense for acquisition, integration, and related costs. The second item was a $0.06 per share expense for mark-to-market adjustments. The third item was a $0.05 per share expense for restructuring and facility consolidation costs. The final item was a $0.08 per share gain on the foreign currency re-measurement of intercompany notes.

87.     Defendant Reed also commented in the press release:

We delivered sequential progress in the first quarter and are off to a solid start, despite the ongoing challenges of a stagnant retail landscape. In the first quarter, growth in retail single-serve coffee and broad gains in snacks led our combined Bay Valley Foods and TreeHouse Private Brands organization, while our cold season products such as non-dairy creamers, hot cereal, and soup were negatively affected by the unseasonably warm weather. I am very pleased with the progress our teams are making integrating the Private Brands business, and our sense of functional unity is growing. Our Private Brands team is already making great progress in customer service improvements and is starting to regain lost distribution that resulted from past service issues. Our integration activities are on track and on budget as a result of the strong collaboration of our teams during the transition.

88.     The press release further discussed the Company's financial condition, and stated:

Adjusted earnings before interest, taxes, depreciation, amortization, and non-cash stock based compensation, or Adjusted EBITDA (a reconciliation to net income, the most directly comparable GAAP (generally accepted accounting principles in the United States) measure, appears on the attached schedule), was $125.2 million in the first quarter of 2016, a 48.2% increase compared to the same period in the prior year. The increase in Adjusted EBITDA this quarter was driven by the inclusion of operating income from the acquisition of the private brands operations ('Private Brands') of ConAgra Foods, Inc., operating efficiencies, and favorable commodity costs, partially offset by unfavorable Canadian foreign exchange and lower legacy volumes. Net sales for the first quarter totaled $1,270.2 million compared to $783.1 million last year, an increase of 62.2%, due to the inclusion of

- 35 -

business from the Private Brands acquisition, partially offset by lower volume/mix, primarily in the Industrial and Export segment, and unfavorable Canadian foreign exchange. Compared to the first quarter of last year, sales in the first quarter of 2016 for the North American Retail Grocery segment increased 72.1%; sales for the Food Away From Home segment increased 27.5%; and sales for the Industrial and Export segment increased 35.0%.

89.     In the Company's Form 10-Q, it repeated the financial and operating results from the press release issued the same day. Attached to the Form 10-Q were SOX certifications signed by Defendants Reed and Riordan attesting to its accuracy.

**July 29, 2016 Form 8-K**

90.     On July 29, 2016, the Company filed a Current Report on Form 8-K with the SEC, which was signed by O'Neill. It the Form 8-K, the Company announced that its "Board of Directors . . . increased the size of TreeHouse's Board from eight to nine members and appointed Linda Massman to the Board, effective immediately, to fill the newly-created vacancy, with a term expiring at TreeHouse's 2019 annual meeting of shareholders." The Company stated that Defendant Massman "will serve on the Board's Audit Committee" and "[a]s a non-employee director, Ms. Massman will receive the same base compensation paid to other non-employee directors of TreeHouse, including a 2016 grant of 1,830 of restricted stock units, which will fully vest after twelve months subject to her continued services as a director through such period."

**August 4, 2016 Form 8-K and Form 10-Q**

91.     On August 4, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC and a Current Report on Form 8-K with an accompanying press release attached as Exhibit 99.1. The Form 8-K was signed by O'Neill and the Form 10-Q was signed by Defendant Riordan.

92.     In the press release, the Company announced financial results for the fiscal quarter ended June 30, 2016 and highlighted:

- 36 -

TreeHouse reported second quarter earnings per fully diluted share of $0.27, compared to $0.72 in 2015; Second quarter adjusted earnings per fully diluted share was $0.54, compared to $0.66 in 2015; Net sales in the second quarter were $1.5 billion, a 103.0% increase from 2015, driven by the Private Brands acquisition; TreeHouse reaffirms full year 2016 earnings per fully diluted share guidance and provides third quarter 2016 outlook.

93.     The press release noted:

TreeHouse . . . today reported second quarter GAAP earnings of $0.27 per fully diluted share compared to $0.72 per fully diluted share reported for the second quarter of last year. The Company reported adjusted earnings per fully diluted share in the second quarter of $0.54 compared to $0.66 in the second quarter of the prior year, excluding the items described below. The Company's 2016 second quarter results included five items noted below that, in management's judgment, affect the assessment of earnings. The first item was a $0.27 per share expense for product recall costs associated with the sunflower seed recall. The second item was a $0.08 per share expense for acquisition, integration, and related costs. The third item was a $0.05 per share expense for restructuring and facility consolidation costs. The fourth item was a $0.03 per share gain for mark-to-market adjustments. The final item was a $0.10 per share gain reflecting the tax impact of the aforementioned adjusting items.

94.     Defendant Reed also commented positively on the Company's outlook in the press

release, and stated:

We continue to progress in accordance with our plans for the year and our second quarter results represent further sequential improvement. Total Company revenue was up significantly due to the Private Brands acquisition. Volume/mix grew 4% in North American Retail Grocery, representing one of our best quarters in many years. Our operating results continue to show steady improvement, as we focus on customers, categories, consumers, and organizational capabilities. The detailed integration of legacy TreeHouse and Private Brands is well underway, and we are gaining momentum. I'm pleased to report that we completed a virtually flawless integration of the acquired condiments business onto the TreeHouse SAP system in early July, linking seven product categories and eleven plants that serve over 500 customers. The work that is being undertaken across the organization to establish standardized processes, organizational structures, functional responsibilities and reporting relationships is extraordinary and is a testament to the robust level of collaboration within our organization.

95.     Defendant Reed continued:

Our work continues as we advance on both strategic and structural fronts within the organization, while improving operating results. With a breadth and scope that is

unmatched in the industry, we have a competitive advantage in our ability to support our customers and their efforts to build their corporate brands, while offering consumers choice and value. Our outreach to strategic customers is ongoing, as we convey the TreeHouse promise of private label and establish standard companywide go-to-market practices.

96.     The press release further discussed the Company's financial condition, and stated:

Net sales for the second quarter totaled $1,541.4 million compared to $759.2 million last year, an increase of 103.0%, due to the inclusion of business from the acquisition of the private brands operations of ConAgra Foods, Inc. ("Private Brands") and favorable volume/mix, primarily in the North American Retail Grocery segment, partially offset by lower pricing and unfavorable Canadian foreign exchange. Compared to the second quarter of last year, sales in the second quarter of 2016 for the North American Retail Grocery segment increased 120.2%; sales for the Food Away From Home segment increased 27.5%; and sales for the Industrial and Export segment increased 84.3%. During the second quarter of 2016, the Company announced a recall of certain products that reduced net sales by $9.9 million, which was not allocated to the segments. The Company expects to be fully indemnified for the amount.

97.     The press release also noted:

With regard to the full year, TreeHouse expects GAAP earnings to be in the range of $2.25 to $2.35 per fully diluted share. Given the inherent uncertainty regarding adjusted items in any future period, it is not feasible to forecast those items. The Company reaffirmed its 2016 full year guidance range of $3.00 to $3.10 in adjusted earnings per fully diluted share. The difference between the full year GAAP and non-GAAP guidance ranges is related to the impact of adjusting items for the six months ended June 30, 2016. The Company expects third quarter GAAP and adjusted earnings to be in the range of $0.75 to $0.80 per fully diluted share.

98.     In the Company's Form 10-Q, it repeated the financial and operating results from the press release issued the same day. Attached to the Form 10-Q were SOX certifications signed by Defendants Reed and Riordan attesting to its accuracy.

**Additional August 4, 2016 Form 8-K**

99.     On August 4, 2016, the Company filed an additional Form 8-K with accompanying press releases attached as Exhibit 99.1 and Exhibit 99.2 with the SEC to announce changes to its executive officers. The Form 8-K was signed by O'Neill. The Company announced that

Defendant Sliva "has been elected President of TreeHouse" and "will have operating responsibility for both operating companies – Bay Valley Foods and TreeHouse Private Brands." Additionally, "[i]n connection with his appointment, Mr. Sliva will be awarded (i) a stock option to purchase 1,580 shares of TreeHouse common stock and (ii) 490 restricted stock units, each under TreeHouse's standard terms and vesting ratably each year over a three-year period."

100.    In the press release that was attached as Exhibit 99.1, Defendant Reed stated the following about Defendant Sliva's appointment:

> Chris' contributions over the last four years have both strengthened and advanced our organization and culture. I'm proud of the way Chris has led our Company through the operational complexity that is inherent in private label. Because of his leadership and efforts to focus our organization on simplification, our legacy business has delivered gross margin expansion year in, year out. Chris has also been the driving force in focusing our organization on the private label fundamentals of customers, categories, consumers and organizational capabilities. As we look forward, it is under Chris' tutelage that we are designing an organizational structure to deliver on the transformative potential of the TreeHouse promise to our customers.

101.    The Form 8-K also announced that Defendant Riordan would retire as Executive Vice President, Chief Financial Officer and Interim President of Private Brands and "transition to a Senior Advisor role upon the appointment of a successor."

**November 3, 2016 Form 8-K**

102.    On November 3, 2016, the Company filed a Current Report on Form 8-K with the SEC with accompanying press releases attached as Exhibit 99.1, Exhibit 99.2, and Exhibit 99.3. The Form 8-K was signed by O'Neill.

103.    In its press release attached to the Form 8-K as Exhibit 99.1, the Company announced financial results for the fiscal quarter ended September 30, 2016 and highlighted:

> Third quarter earnings per fully diluted share was $0.65, compared to $0.65 in the third quarter of 2015; Third quarter adjusted earnings per fully diluted share was $0.70,

compared to $0.86 in the third quarter of 2015; Net sales in the third quarter were $1.6 billion, a 98.7% increase from 2015; Retail volume/mix increased 4.6% this quarter; TreeHouse lowers full year 2016 earnings per fully diluted share guidance and provides fourth quarter 2016 outlook.

104.    The press release noted:

TreeHouse . . . today reported third quarter GAAP earnings per fully diluted share of $0.65 compared to $0.65 reported for the third quarter of last year. The Company reported adjusted earnings per fully diluted share in the third quarter of $0.70 compared to $0.86 for the third quarter of last year, excluding the items described below. The Company's 2016 third quarter results included five items noted below that, in management's judgment, affect the assessment of earnings. The first item was a $0.10 per share expense for restructuring and facility consolidation costs. The second item was a $0.08 per share expense for acquisition, integration, and related costs. The third item was a $0.02 per share expense for foreign currency losses on the re-measurement of intercompany notes. The fourth item was a $0.12 per share gain for mark-to-market adjustments. The final item was a $0.03 per share gain reflecting the tax impact of the aforementioned adjusting items.

105.    Notably, TreeHouse announced in its press release that it lowered its full year adjusted earnings per share forecast to $2.80-$2.85 per share from $3.00-$3.10. Defendant Reed further discussed the failure to meet expectations and stated that "while the Private Brands business showed sequential improvement, its results fell short of our expectations for the quarter." He continued:

We are lowering our full year 2016 earnings expectations due to the combination of lower than expected third quarter sales from the Private Brands business, along with our belief that fourth quarter Private Brands sales will fall short of our goal to stem its year-over-year sales declines. We do believe this is a short term situation. Our new go-to-market sales structure is designed to improve our ability to help customers merchandise and drive their private label programs. Our resumed focus on our products and customers in the fourth quarter will quickly restore our Company to our original expectations for the combined TreeHouse Foods business.

106.    In the press release the Company addressed future expectations:

The Company expects fourth quarter GAAP and adjusted earnings to be in the range of $1.07 to $1.12 per fully diluted share. Because the Company cannot predict some of the items included in reported GAAP results, such as the impact of foreign exchange, the fourth quarter forecast for both GAAP and adjusted earnings are the same . . . . With regard to

- 40 -

the full year, TreeHouse expects GAAP earnings to be in the range of $1.95 to $2.00 per fully diluted share and adjusted earnings to be in a range of $2.80 to $2.85 per fully diluted share. The difference between the high end and low end of the full year GAAP and non-GAAP guidance ranges is consistent with the $0.85 impact of adjusting items per fully diluted share for the nine months ended September 30, 2016 . . . .

107. In its press release attached to the Form 8-K as Exhibit 99.2, the Company

announced plans to close a facility in Delta, British Columbia and to reduce jobs at its Battle Creek,

Michigan facility. The Company stated:

> TreeHouse . . . today announced its intention to close a facility in Delta, British Columbia and reduce its manufacturing footprint in Battle Creek, Michigan. The decision follows an analysis of the Company's plant network to align operations with the current and future needs of its customers and eliminate excess manufacturing capacity. The Delta facility employs approximately 90 employees and produces frozen griddle products, primarily for the North American Retail Grocery segment. Production is expected to cease in early 2018. The Company operates two facilities in Delta, and this announcement only affects the frozen griddle facility. The Battle Creek facility produces ready-to-eat cereal, primarily for the North American Retail Grocery segment. The partial closure will affect approximately 100 of the current 160 employees over a 15 month period beginning in January 2017. The decision is being announced in advance of the downsizing in order to provide employees with as much notice as possible and to ensure a seamless transition for customers. Both the Battle Creek and Delta griddle facilities were part of the Company's acquisition of the ConAgra Foods private brands business in February 2016. The Company will provide support to employees whose positions are being eliminated. Total costs to close the Delta facility and downsize Battle Creek are expected to be approximately $14.7 million, or $0.16 per fully diluted share, of which approximately $6.8 million, or $0.08 per fully diluted share, is expected to be in cash. Components of the charges include non-cash asset write-offs of approximately $7.9 million, employee-related costs of approximately $4.6 million and other closure costs of approximately $2.2 million. The Company expects approximately $4.0 million and $3.1 million of the charges to be incurred in the fourth quarter of this year and the first quarter of 2017, respectively, with the balance of the charges being incurred through the end of 2018.

108. In its press release attached to the Form 8-K as Exhibit 99.3, the Company

announced the resignation of Defendant Sliva as President, just under three months after assuming

the position. In the same press release, the Company stated that Defendant Riordan would serve

as President while the Company conducts a search for a new President and he "will have oversight of both of the operating companies – Bay Valley Foods and TreeHouse Private Brands."

**November 3, 2016 Conference Call**

109.    On November 3, 2016, the Company held a conference call for analysts and investors.  During the call, Defendant Reed stated, in relevant part:

> I also have further analysis of our recent performance and current outlook.  Specifically, the shortfalls in Q3 earnings and Q4 outlook are principally attributable to a miscalculation on our behalf regarding the internal issues, not market conditions or organizational capability.  We had underestimated the heavy burden that the acquired Private Brands team would bear under the combined weight of the TSA, IT conversion, integration, operating Company reorganization and ConAgra's dissolution.  Simply put, we inadvertently overloaded the newly acquired team with an administrative workload that interfered with their day jobs and distanced them from the private label marketplace.  The effect of this miscalculation can best be seen in the dichotomy between the legendary TreeHouse and acquired Private Brands top lines in the third quarter.  Bay Valley retail units posted an almost 5% unit volume gain, their highest such performance in eight quarters in sharp contrast to Private Brands 3% unit volume loss under exactly similar market conditions.  Both segments operated proficiently, especially in customer service and order fill rates.

110.    Defendant Reed continued: "While there were various category and customer puts and calls in play, our team's assessment is that our current performance reflects, to a large extent, a self-inflicted wound.  We plan to reorganize our several operating companies into a single united customer facing approach, realigning our teams from their present sales channel orientation to a product category basis."

**November 3, 2016 *Wall Street Journal* Article**

111.    On November 3, 2016, *The Wall Street Journal* published an article titled: "TreeHouse Foods' Shares Fall Amid Executive Shuffle."  The article cited William Chappell, Jr., an analyst for SunTrust Robinson Humphrey, who stated: "The exit of Mr. Sliva and the pending retirement of Mr. Riordan are troubling signs.  In our opinion, two of the people most responsible

for making the private brands deal are no longer in their operational roles, and cracks in the deal are already starting to appear. We still believe in the long term potential for the deal but now believe the stock is dead money, at best, until mid-2017."

**Price of TreeHouse Stock Falls**

112. On November 2, 2016, the day before the November 3, 2016 press releases, conference call, and *The Wall Street Journal* article, the price of TreeHouse stock at closing was $86.59. On November 3, 2016, the price of TreeHouse stock at closing was $69.72.

**December 2, 2016 *Crain's Chicago Business* Article**

113. On December 2, 2016, *Crain's Chicago Business* published an article titled "Why TreeHouse investors are so mad." The article stated, in relevant part:

> [Defendant Reed] . . . is having trouble digesting his latest acquisition. The $2.7 billion purchase of ConAgra Foods' private-brands business in February was the largest of more than a dozen deals Reed has closed since TreeHouse was spun out of Dean Foods in 2005. It looked like a bargain: TreeHouse paid $4 billion less than ConAgra shelled out to acquire the business only three years earlier. On second thought, the markdown might have been a bad sign. Stubborn sales declines at private brands marred TreeHouse's third quarter results, which fell short of Wall Street's expectations and forced the company to trim full-year financial projections. If that weren't enough of a shock for investors used to stellar results from TreeHouse, they also learned of upheaval in the executive suite. President Christopher Sliva left and was replaced on an interim basis by CFO Dennis Riordan, who had been planning to retire. The double dose of downbeat news sent TreeHouse stock down 22 percent on Nov. 3, its biggest daily drop since 2005.

114. The article continued:

CEO Reed now faces his most serious setback in an 11-year growth spree that lifted TreeHouse's annual revenue to $7 billion from $700 million. He bet heavily on the ConAgra business, which now represents more than half of TreeHouse's sales. To finance the acquisition, the Oak Brook company borrowed $1.8 billion and issued $862.5 million worth of new stock. So far the deal has brought nothing but pain. TreeHouse's operating profit margin shrank to 4.9 percent in the third quarter from 7.8 percent a year earlier. Acquisition financing pushed its debt ratio well above the industry average while diluting the stakes of investors who held TreeHouse stock before the deal. After nearly doubling

- 43 -

in a five-year climb that peaked July 11, the stock has since lost 33 percent of its value, to $67.05 yesterday.

115. The statements referenced in ¶¶ 70, 72-100, 102-106, 109, and 110 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made and/or caused the Company to make false and/or misleading statements and/or fail to disclose: (1) that the Company's private label business was underperforming, (2) that the Company had overstated its 2016 guidance, and (3) the Company's acquisition strategy was underperforming. As a result of the foregoing, the Company's public statements referenced herein were materially false and misleading at all relevant times.

## DAMAGES TO TREEHOUSE

116. As a direct and proximate result of the Individual Defendants' conduct, TreeHouse will lose and expend many millions of dollars.

117. Such expenditures include, but are not limited to, legal fees associated with the Securities Fraud Action filed against the Company and two of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118. Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

119. As a direct and proximate result of the Individual Defendants' conduct, TreeHouse has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

- 44 -

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

120.    Plaintiff brings this action derivatively and for the benefit of TreeHouse to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of TreeHouse and unjust enrichment, as well as the aiding and abetting thereof.

121.    TreeHouse is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

122.    Plaintiff is, and at all relevant times has been, a TreeHouse shareholder.  Plaintiff will adequately and fairly represent the interests of TreeHouse in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

123.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

124.    A pre-suit demand on the Board of TreeHouse is futile and, therefore, excused.  At the time of filing of this action, the Board consists of nine directors, who are Defendants Reed, Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, Ussery, and Vermylen (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to five of the nine Directors that are on the Board at the time this action is commenced.

125.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact while three of the Individual Defendants engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

126.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, three of the Individual Defendants, including two of the nine Directors, collectively sold over a million dollars worth of Company stock at artificially inflated prices based on inside material information.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

127.    Additional reasons that demand on Defendant Reed is futile follow.  Defendant Reed is the Company's Chief Executive Officer and the Chairman of the Board of Directors.  He received lavish compensation, including $6,478,982 in 2015.  Thus, as the Company admits, he is a non-independent director.  Defendant Reed was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, almost all of which he certified pursuant to SOX, and one of which he signed, and those contained

in the press releases, many of which he personally made. His large Company stock holding, worth over $75.8 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. According to the 2016, Proxy Statement, "the actual compensation received by each executive is determined by the financial and stock price performance of the Company" and the Company "deliver[s] a substantial portion of [named executive officers'] total compensation in the form of equity awards and other long-term incentive vehicles." As a byproduct of the Company's "pay-for-performance compensation philosophy," Defendant Reed received 15% of his 2015 total compensation in the form of an annual incentive award and 69% from long-term incentive awards. Therefore, Defendant Reed had additional motive in facilitating and participating in the fraud and keeping the company's stock price as high as possible. Moreover, Defendant Reed conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, he is a defendant in the Securities Fraud Action. Thus, for these reasons, too, Defendant Reed breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Bayly is futile follow. Defendant Bayly is a Company Director and Chairman of the Compensation Committee. He received lavish compensation, including $244,889 in 2015. His large Company stock holding, worth over $1.4 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, as a long-time Director, Defendant Bayly conducted

little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Bayly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.     Additional reasons that demand on Defendant Massman is futile follow. Defendant Massman is a Company Director. As a Director, Defendant Massman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, too, Defendant Massman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

130.     Additional reasons that demand on Defendant O'Brien is futile follow. Defendant O'Brien is a Company Director, Chairman of the Nominating and Corporate Governance Committee, and a member of the Audit Committee. He received lavish compensation, including $252,389 in 2015. His large Company stock holding, worth over $1 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, as a long-time Director, Defendant O'Brien conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons,

- 48 -

too, Defendant O'Brien breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant O'Connell is futile follow. Defendant O'Connell is a Company Director and Chairman of the Audit Committee. He received lavish compensation, including $247,389 in 2015. His large Company stock holding, worth over $1.9 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, as a long-time Director, Defendant O'Connell conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant O'Connell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Sardini is futile follow. Defendant Sardini is a Company Director and serves on the Compensation Committee. She received lavish compensation, including $254,889 in 2015. Her insider sale before the fraud was exposed, which yielded $378,289.10, demonstrates her motive in facilitating and participating in the fraud. Her large Company stock holding, worth over $912,115 at the beginning of the Relevant Period, reveals her interest in keeping the Company's stock price as high as possible. Moreover, Defendant Sardini conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (she signed the Form 10-K referenced above), consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her

duties to protect corporate assets.  Thus, for these reasons, too, Defendant Sardini breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

133.     Additional reasons that demand on Defendant Smith is futile follow.  Defendant Smith is a Company Director and serves on both the Audit Committee and Nominating and Corporate Governance Committee.  He received lavish compensation, including $242,389 in 2015. His insider sale before the fraud was exposed, which yielded $610,305, demonstrates his motive in facilitating and participating in the fraud.  His large Company stock holding, worth over $1.9 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.  Moreover, as a long-time Director, Defendant Smith conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.     Additional reasons that demand on Defendant Ussery is futile follow.  Defendant Ussery is a Company Director and a member of both the Audit Committee and Nominating and Corporate Governance Committee.  He received lavish compensation, including $242,389 in 2015. His large Company stock holding, worth over $2 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.  Moreover, as a long-time Director, Defendant Ussery conducted little, if any, oversight of the Company's engagement

in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Ussery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Vermylen is futile follow. Defendant Vermylen is a Company Director. He received lavish compensation, including $529,889 in 2015. Due to Vermylen's consulting agreement with the Company and related payments, the Company admits that he is not an independent Director. His large Company stock holding, worth over $17.8 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, as a long-time Director, Defendant Vermylen conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the Form 10-K referenced above), consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Vermylen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additionally, the demand in this case is excused because the Directors, who are named as defendants in this action, are beholden to each other. According to the Company's 2016 Proxy Statement, "[t]he Board is responsible for approving candidates for Board membership and has delegated the process of screening and recruiting potential director nominees to the Nominating and Corporate Governance Committee in consultation with the Chairman of the Board

and CEO." Thus, members of this committee make decisions that directly affect other Directors'
participation on the board. Directors may fear retaliation by the Board or Nominating and
Corporate Governance Committee should Plaintiff's demand be accepted.

137.    The Directors, as members of the Board, were and are subject to the corporate Code
of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable
laws, rules, and regulations. The Code of Ethics requires all employees, officers and directors to
avoid activities or relationships that conflict with the Company's interests or adversely affect the
Company's reputation. The Directors did not comply with the requirements of the Code of Ethics.
The Directors violated the Code of Ethics because they participated in or were recklessly unaware
of the materially false and misleading statements contained in the Company's public filings and
communications, and in failing to maintain proper internal control and regulatory compliance.
Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for
breaching their fiduciary duties, and therefore demand upon them is futile.

138.    The Directors have longstanding business and personal relationships with each
other and the Individual Defendants that preclude them from acting independently and in the best
interests of the Company and the shareholders. These conflicts of interest precluded the Directors
from adequately monitoring the Company's operations and internal controls and calling into
question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

139.    Each of the Directors is liable for engagement in the scheme to make false and
misleading statements and/or omissions of material fact, consciously disregarded his duties to
monitor engagement in the scheme, and consciously disregarded his duties to protect corporate

assets. Thus, each of the Directors faces a substantial likelihood of liability for breaching his fiduciary duties, and therefore demand upon him is futile.

140. TreeHouse has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for TreeHouse any part of the damages TreeHouse suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

141. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

142. The acts complained of herein constitute violations of fiduciary duties owed by TreeHouse's officers and directors, and these acts are incapable of ratification.

143. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of TreeHouse. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any

action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of TreeHouse, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

144.    If there is no directors' and officers' liability insurance, then the Directors will not cause TreeHouse to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

145.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of TreeHouse's business and affairs.

148.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of TreeHouse.

150.    In breach of their fiduciary duties owed to TreeHouse, the Individual Defendants willfully or recklessly caused the Company to issue false and misleading statements and/or omissions of material fact and to cause the Company to increase the Individual Defendants' salaries and stock grants, to the detriment of the shareholders and the Company. Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

151.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TreeHouse's securities.

152.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were

not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TreeHouse's securities.

153. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

154. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, TreeHouse has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

155. Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

156. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157. By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, TreeHouse.

158. The Individual Defendants either benefitted financially from the improper conduct, received proceeds from insider sales, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from

TreeHouse that was tied to the performance or artificially inflated valuation of TreeHouse, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

159.     Plaintiff, as a shareholder and a representative of TreeHouse, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, proceeds from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

160.     Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

161.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence TreeHouse, for which they are legally responsible.

163.     As a direct and proximate result of the Individual Defendants' abuse of control, TreeHouse has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, TreeHouse has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.     Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of TreeHouse in a manner consistent with the operations of a publicly-held corporation.

167.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, TreeHouse has sustained and will continue to sustain significant damages.

168.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiff, on behalf of TreeHouse, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

172.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused TreeHouse to waste valuable

corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

173. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

174. Plaintiff on behalf of TreeHouse has no adequate remedy at law.

### JURY DEMAND

175. Plaintiff demands trial by jury.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of TreeHouse, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to TreeHouse;

(c) Determining and awarding to TreeHouse the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing TreeHouse and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect TreeHouse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Articles of Incorporation and such others as may be necessary to ensure proper corporate governance policies:

> 1.  A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board, including the institution of a satisfactory Code of Ethics for directors and senior officers;
>
> 2.  A provision to permit the shareholders of TreeHouse to nominate at least five candidates for election to the board; and
>
> 3.  A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding TreeHouse restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: February 7, 2017                            Respectfully submitted,

> /s Matthew T. Heffner
> Matthew T. Heffner
> **HEFFNER HURST**
> 30 North LaSalle Street, 12th Floor
> Chicago, Illinois 60602
> Telephone: (312) 346-3466
> Facsimile: (312) 346-2829
> Email: mheffner@heffnerhurst.com
>
> *Liaison Counsel for Plaintiff*

- 60 -

Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 11771
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*