## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BRIAN LAVIN,
            Plaintiff

        v.

SAM K. REED, *et al.*,
            Defendants

No. 17 CV 1014

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiffs Brian Lavin and Donald Bartelt are shareholders of TreeHouse Foods, Inc. ("TreeHouse") who filed this consolidated derivative action against TreeHouse's current and former officers and directors. They allege that Defendants breached their fiduciary duties and made material misrepresentations concerning TreeHouse's 2016 acquisition of ConAgra's private brands business. Plaintiffs designated a single operative complaint, *see* R. 74, 75, which Defendants now move to dismiss. R. 79.[1] For the reasons that follow, the Court grants Defendants' motion and dismisses Plaintiffs' claims with leave to amend.

---

[1] Defendants' motion for leave to file an oversized brief in support of their motion to dismiss, R. 80, is hereby granted *instanter*.

## BACKGROUND[2]

TreeHouse is a publicly traded Delaware corporation headquartered in Oak Brook, Illinois, that manufactures branded food products for grocery stores, warehouse chains, and other retailers. R. 1 ¶ 17. Defendants are current and former directors and officers of TreeHouse. *See id.* ¶¶ 18–51. Defendant Sam Reed is TreeHouse's former Chairman and CEO. R. ¶ 18. He served as the company's President from July 2011 to August 2016, when he was replaced by Defendant Christopher Sliva. *Id.* ¶¶ 18. Sliva was President until November 2016, when he stepped down and was replaced by Defendant Dennis Riordan (formerly the company's CFO and Executive Vice President). The remaining Defendants, George Bayly, Linda Massman, Dennis O'Brien, Frank O'Connell, Ann Sardini, Gary Smith, Terdema Ussery, and David Vermylen (together with Reed, the "Director Defendants") were members of TreeHouse's board of directors on or around February 2, 2017, when the complaint was filed. *See id.* ¶¶ 18–51. The complaint alleges that all the Director Defendants except Massman (who joined TreeHouse's board in July 2016) own TreeHouse stock and receive compensation from the company in the form of base salary and restricted stock units. *See id.*

On February 1, 2016, TreeHouse acquired ConAgra Foods, Inc.'s private brands business—Ralcorp Holdings, Inc.— in an all-cash transaction for $2.7 billion

---

[2] The Court takes the facts in the background section from the complaint and exhibits attached thereto. *Philips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). The Court also considers documents that are central to the complaint and referred to in it and takes judicial notice of matters of public record. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

(the "Private Brands Acquisition"). *Id.* ¶ 3. The company disclosed this transaction in its public filings with the Securities and Exchange Commission ("SEC"), including various Form 8-Ks, Form 10-Qs, and the company's 2015 Form 10-K, which was signed by each of the Director Defendants except Massman. *See generally id.* A February 11, 2016 press release stated that "TreeHouse net sales are expected to double in 2016 to approximately $6.3–6.5 billion, driven by the addition of the Private Brands Business." *Id.* ¶ 79. In subsequent press releases, Reed commented positively on the progress of the acquisition, stating that the company was "making great progress," *id.* ¶ 87, and that "[t]he detailed integration of legacy TreeHouse and Private Brands is well underway, and we are gaining momentum." *Id.* ¶ 94

Despite these statements, integration of the Private Brands business was more difficult than anticipated. On November 3, 2016, the company announced that its third quarter earnings would be substantially below market expectations. *Id.* ¶¶ 102–06. A press release published that same day indicated that the company's acquisition strategy was underperforming, that it was closing a facility in Delta, British Columbia, and that it was reducing headcount at a manufacturing facility in Battle Creek, Michigan. *Id.* ¶¶ 104–107. Compounding the bad news, the company announced that Sliva would resign as President after having served just three months, and Riordan, his interim replacement, would retire shortly thereafter. *Id.* ¶¶ 109, 111. The *Wall Street Journal* ran an article that same day, noting that Sliva's exit and Riordan's pending retirement were "troubling signs" and that "cracks in the deal are already starting to appear." *Id.* ¶ 111. By the end of the day, TreeHouse's

3

share price had fallen by nearly 20% from $85.59 to $69.72 per share. *Id.* ¶112. Public records also revealed that Sliva, Sardini, and Smith had collectively sold over a million dollars' worth of TreeHouse stock while the price was inflated following the acquisition and before the November 3 announcement. *Id.* ¶ 126.

Shareholders cried foul. The same month that the report was issued, a group of plaintiffs filed a class action securities fraud lawsuit in this District, alleging that TreeHouse's officers knowingly made false or misleading statements and material omissions about the Private Brands Acquisition. *See Public Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 16 C 10632 (N.D. Ill. 2016) (the "Securities Class Action"). Other shareholders entered the fray and filed derivative actions, including the two above-captioned lawsuits and two other state court cases filed in the Circuit Court of Cook County, Chancery Division. *See Wells v. Reed, et al.*, Case No. 2016-CH-16359; *City of Ann Arbor Emps.' Ret. Sys, v. Reed, et al.*, Case No. 2019-CH-06753. In this case, Plaintiffs alleged that Reed, Sliva, Riordan, and the Director Defendants (i) breached their fiduciary duties to TreeHouse by making material misrepresentations and failing to exercise appropriate oversight, (ii) unjustly enriched themselves, (iii) abused their control over the company, (iv) grossly mismanaged the company, and (v) caused corporate waste. *See* R. 1.

The parties initially agreed to stay this case because the Securities Class Action involved "overlapping parties and factual allegations." R. 18 at 2. The stay was extended after Judge Der-Yeghiayan denied a motion to dismiss the Securities Class Action and that case proceeded to discovery. R. 35. The parties stipulated that

Plaintiffs in this matter would have access to the documents produced in the Securities Class Action as well as documents produced in the other derivative cases. *Id.* ¶ 4. Ultimately, the Securities Class Action was settled with court approval on November 17, 2021, renewing focus on the present litigation. *See* Securities Class Action, Dkt. No. 191. The parties engaged in settlement discussions but could not resolve their dispute. *See* R. 65 ¶ 9; R. 67. With no end in sight, the Court lifted the stay and ordered Plaintiffs to file a single operative complaint. R. 74.

Plaintiffs chose to designate the original February 7, 2017, complaint as the operative complaint for the consolidated action. R. 75. Though the complaint remained the same, the underlying facts had changed. According to publicly available filings, seven of the nine Director Defendants had left the company. *See* R. 81-5 (TreeHouse 2022 Form 10-K). Only two of the Director Defendants—Massman and Sardini—remained. *See id.*

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 23.1, contending that: (1) Plaintiffs are required, but failed, to plead demand futility as to TreeHouse's current board of directors; (2) even if Plaintiffs are not required to plead demand futility to the current board, they have not sufficiently pled demand futility as to the Director Defendants; and (3) Plaintiffs fail to state a claim. R. 79. The Court now addresses each of these arguments.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint, not the merits of the allegations. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). To overcome a motion to dismiss,

a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raises the right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 803 (7th Cir. 2003).

When one or more shareholders or members of a corporation bring a derivative action to enforce a right that the corporation may properly assert but has failed to enforce, Federal Rule of Civil Procedure 23.1 applies. Fed. R. Civ. P. 23.1(a). Rule 23.1 provides that, if the plaintiff does not fairly and adequately represent the interests of similarly-situated shareholders, the derivative action may not be maintained. *Id.* Prior to initiating suit, the plaintiff must "state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Rule 23.1 "concerns itself solely with the adequacy of the pleadings; it creates no substantive rights." *Starrels v. First Nat. Bank of Chi.*, 870 F.2d 1168, 1170 (7th Cir. 1989). Though federal law determines whether a plaintiff has pleaded facts with sufficient detail, state law determines whether a plaintiff's stated reasons are sufficient. *Lowinger v. Oberhelman*, 924 F.3d 360, 366 (7th Cir. 2019).

## ANALYSIS

Because Plaintiffs allege harm to TreeHouse rather than harm to individual shareholders, their claims are derivative in nature. A derivative suit is brought by an

investor on behalf of the corporation, asserting the corporation's (not the investor's) right to recover. *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998). Derivative suits are "an anomaly of corporate governance." *Dorvit ex rel. Power Sols. Intl. Inc. v. Winemaster*, 950 F.3d 984, 988 (7th Cir. 2020). "Only when the corporation's board defaults in its duty to protect the interests of the investors" may a plaintiff pursue a derivative suit. *Id.* (citation omitted).

Under Illinois' choice of law rules, Plaintiffs' derivative claims are governed by the law of Delaware, TreeHouse's state of incorporation. *Lowinger*, 924 F.3d at 366. The Court therefore looks to Delaware law to determine whether Plaintiffs have satisfied the requirements of Rule 23.1(b).

## I. DEMAND FUTILITY UNDER DELAWARE LAW

Under Delaware law, "directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). To prevent shareholders from arrogating corporate powers to themselves, derivative plaintiffs must allege with particularity that either (1) they have made a demand on the board of directors of the company to initiate the suit or (2) such demand would have been futile. *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988). The requirement of a shareholder demand "is more than a pleading requirement, it is a substantive right of the shareholder and the directors." *Abbott Labs.*, 325 F.3d at 804; *Dorvit*, 950 F.3d at 988–89 ("[T]he demand futility

requirement is not a mere technical, procedural hurdle [but] a substantive *sine qua non* of derivative suits.").

To show futility, a plaintiff must allege facts sufficient to raise the inference that a majority of the directors (1) are "interested" due to a disqualifying financial conflict, (2) face a substantial risk of personal liability for the claims that are the subject of the litigation, or (3) lack independence from a director in one of the first two categories. *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

Plaintiffs allege that demand would have been futile as to the 2017 board and therefore filed suit without making a demand. R.1 ¶¶ 123–45. At the outset, Defendants argue that Plaintiffs must allege demand futility as to the current board rather than the 2017 board. R. 80-1 at 10–12. The Court first considers which board is the proper subject of Plaintiffs' demand futility allegations before proceeding to assess the merits of Plaintiffs' demand futility allegations.

### A. Whether Demand Futility Must be Assessed as to the 2017 Board or the 2022 Board

The Court first considers whether TreeHouse's 2017 or 2022 board of directors is the proper subject of Plaintiffs' demand futility allegations. As indicated in TreeHouse's public filings, only two Director Defendants remained on the board in October 2022 when the operative complaint was designated. R. 81-5. Plaintiffs do not allege demand futility as to TreeHouse's new board. Plaintiffs' ability to survive Defendants' motion therefore rests on the assertion that demand futility should be

tested as to the 2017 board (i.e. the Director Defendants). *See In re Affiliated Comp. Servs. Inc. S'holders Litig.*, 2009 WL 296078, at *7 (Del. Ch. Feb. 6, 2009).

The Court concludes that the proper inquiry with respect to this complaint is whether Plaintiffs have sufficiently pled demand futility as to the 2017 board. Generally, demand futility must be analyzed as to the directors who were on the board on the date that the complaint was filed. *See, e.g.*, *In re InfoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) ("[D]emand is made against the board of directors at the time of filing of the complaint."). In this case, the date-of-filing rule is dispositive. Because Plaintiffs filed their complaint in 2017, it is TreeHouse's 2017 board—and not the 2022 board—that is relevant for demand futility purposes.

Defendants nonetheless argue that demand futility should be assessed as to 2022 board because Plaintiffs' claims were not "validly in litigation" during the period that the lawsuit was stayed. R. 80-1 at 11–12; R. 87 at 4–6.

Delaware law recognizes a limited exception to the date-of-filing rule for claims that are "not already validly in litigation" at the time that a complaint is filed or amended. *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) (citing *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990)). "[T]he term 'validly in litigation' means a proceeding that can or has survived a motion to dismiss." *Id.* at 779. As a threshold matter, for the exception to apply, there must be two complaints—an original complaint and a complaint filed or amended after a change in board composition. *See, e.g.*, *id.* 906 A.2d at 786; *Harris*, 582 A.2d at 230. A derivative plaintiff is *not* required to make a demand on a new board if: (1) both the first complaint and the subsequent

9

complaint state well-pleaded derivative claims, (2) the original complaint satisfies the legal test for demand futility, and (3) the act or transaction complained of in the subsequent complaint is essentially the same as that challenged in the original complaint. *Braddock*, 906 A.2d at 786.

Defendants cannot rely on the "validly in litigation" exception here. In the first place, there is only one complaint; there has been no amendment or refiling. The complaint that Plaintiffs designated in October 2022 is the same complaint that Plaintiffs filed in 2017. Plaintiffs' decision to stand on the allegations in their 2017 complaint after the stay was lifted is also not akin to a voluntary dismissal and refiling (as in *Braddock*). Unlike a stay, a voluntary dismissal results in the dismissal of claims and the termination of a civil case. *See Braddock*, 906 A.2d at 786 ("A complaint that is dismissed without prejudice but with express leave to amend is nevertheless a dismissed complaint."). By contrast, where an action has been stayed, there has been no "judicial determination" as to the validity of the claims. *Id.*

Defendants appear to suggest that Plaintiffs' decision to designate the operative complaint was the functional equivalent of an amendment. *See* R. 84 at 10–11; R. 87 at 4–5. But this comparison does not help. Even if Plaintiffs' designation of the operative complaint in October 2022 was considered an amendment, under *Braddock*, the Court would still need to determine whether "the *original* complaint satisfied the legal test for demand futility." 906 A.2d at 786 (emphasis added); *see also In re Affiliated Comp. Servs.*, 2009 WL 296078, at *8 (applying *Braddock* and looking to prior complaint to determine whether plaintiff was obligated to allege

demand futility as to a new board in an amended complaint). This would require the Court to make the very inquiry that Defendants wish to avoid, namely, whether demand was futile as to the Director Defendants. In short, Defendants cannot escape analyzing demand futility as to the 2017 board by arguing that Plaintiffs' claims were not "validly in litigation."

Defendants also push for an equitable departure from the date-of-filing rule, citing *Park Employees' & Retirement Board Employees' Annuity & Benefit Fund of Chicago v. Smith*, an unpublished decision in which the Delaware Chancery Court held that a plaintiff was not required to allege futility as to the board that existed on the date that the complaint was filed, but rather a board that was put into place four days later. No. CV 11000-VCG, 2016 WL 3223395, at *10–11 (Del. Ch. May 31, 2016). Invoking equitable principles to depart from the "bright line" date-of-filing rule, the Chancery Court noted that the change to the board's makeup had been announced in a proxy statement mailed to stockholders nearly a month before the lawsuit was filed, and that the old board would not have had time to consider the demand before stepping down. *Id.* at *11.

The argument that *Park Employees* supports an equitable exception to the date-of-filing rule here is unpersuasive. First, ignoring any similarities between *Park Employees* and this case, it is not the proper role of a federal district court to create equitable exceptions to binding state case law based on unpublished precedent. *See Alper v. Altheimer & Gray*, 257 F.3d 680, 688 (7th Cir. 2001) ("It is not appropriate

for a federal court []to distinguish state precedent for the purpose of adopting the reasoning of a non-binding state court decision.")

Moreover, in *Park Employees*, the crucial fact was that publicly available information indicated that the board's composition was about to change before the complaint was filed. *Park Emps.'*, 2016 WL at *11. Here, however, there are no facts indicating that Plaintiffs knew or had reason to know that the composition of TreeHouse's board would change at the time that they filed their initial complaint. Nor are there facts indicating that the 2017 board would not have had time to consider a shareholder demand. Requiring Plaintiffs to allege demand futility as to the 2017 board would therefore not invite gamesmanship or lead to an absurd, "Kafkaesque result." *Id.*

In sum, this Court applies the date-of-filing rule and concludes that Plaintiffs' allegations of demand futility should be addressed relative to the Director Defendants who served on TreeHouse's board in 2017 when the complaint was filed.

## B. Whether Plaintiffs Have Adequately Alleged Demand Futility as to the Director Defendants

Having determined that the 2017 board is the proper focus for demand futility analysis, the Court now considers whether Plaintiffs have plausibly alleged demand futility for a majority of the nine Director Defendants. Plaintiffs must plead particularized facts indicating that a majority of the board either (i) received a material personal benefit from the alleged misconduct, (ii) faced a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand, or (iii) "lack[ed] independence" from someone who falls within the first two

12

categories. *Zuckerburg*, 262 A.3d at 1058. The allegations must proceed "on a director-by-director basis." *Id.* at 1059; *accord Raul v. Rynd*, 929 F. Supp. 2d 333, 346 (D. Del. 2013) ("Plaintiff must undertake a 'director-by-director analysis'" to demonstrate demand futility).

### 1. Interestedness

The first question under *Zuckerberg*'s demand futility test is whether any of the nine Director Defendants are "interested" in the subject matter of the complaint. *Zuckerberg*, 262 A.3d at 1058. To satisfy their pleading burden, Plaintiffs must allege particularized facts showing that the Director Defendants "received a material personal benefit from the alleged misconduct." *Id.*

Plaintiffs fail to plead particularized facts indicating that the Director Defendants received a personal benefit from the challenged conduct in the complaint. To establish interestedness, Plaintiffs first point to the fact that the Director Defendants had large holdings of TreeHouse stock and therefore had an "interest in keeping the Company's stock price as high as possible." R.1 ¶¶ 127, 128, 130–35. The difficulties with this argument are obvious. First, there is no prohibition under Delaware law for a director to own stock of the company they work for. *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 974 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004). The fact that a director owns stock in the corporation does not make them "interested" for the purposes of the demand analysis. *See Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003).

Second, to the extent that the Director Defendants remained TreeHouse shareholders after the November 3, 2016 press release and related disclosures, they

did not benefit to the detriment of other shareholders (as is the case in the typical self-dealing transaction). *Compare Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 575 (Del. Ch. 2015) ("[A] director is not disinterested if he or she . . . expects to derive any personal financial benefit from in in the sense of self-dealing") (cleaned up) (citation omitted). To the contrary, the Director Defendants who owned stock on November 3, 2016 were also harmed by the decline in TreeHouse's share price.

Plaintiffs also point to the Director Defendants' "lavish compensation" in the form of salary and restricted stock units. R. 1 ¶¶ 128, 130–35. But "[u]nder Delaware law, directors are generally not considered interested . . . simply because they receive compensation from the company." *Calma*, A.3d 563 at 576 (cleaned up) (quotation marks and citation omitted); *InfoUSA, Inc. S'holders Litig.*, 953 A.2d at 983 ("[A]llegations of payment of director's fees, without more, do not establish any financial interest."). Plaintiffs do not allege particularized facts showing that the Director Defendants' compensation was disproportionate to their position, or that it relevantly tied to the TreeHouse acquisition and alleged misstatements. *Litt v. Wycoff*, 2003 WL 1794724, at *10 (Del. Ch. Mar. 28, 2003) (dismissing on demand futility grounds in the absence of "particularized allegations" that director's compensation was disproportionate).

Finally, Plaintiffs allege that two Director Defendants—Sardini and Smith—sold TreeHouse stock during the time period that its price was inflated. R. 1 ¶¶ 41, 45. But "a director does not become 'interested' for demand futility purposes merely because he has sold shares of the company's stock." *Marvin H. Maurras Revocable Tr.*

14

*v. Bronfman*, No. 12 C 3395, 2013 WL 5348357, at *24 (N.D. Ill. Sept. 24, 2013) (collecting cases). If combined with knowledge that TreeHouse's stock price was artificially inflated, Sardini and Smith's sale of stock during the relevant period might give rise to a claim of insider trading. *See, e.g.*, *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949). That possibility is further addressed below. Taken alone, however, the fact that Sardini and Smith sold TreeHouse stock is insufficient to demonstrate interestedness. *Marvin H.*, WL 5348357, at *24. Consequently, Plaintiffs have not alleged particularized facts indicating that any of the Director Defendants are interested in the subject matter of the litigation.

### 2.    Substantial Likelihood of Liability

The second prong of the *Zuckerberg* test asks whether members of the board of directors face a substantial likelihood of liability for the conduct that is the subject matter of the demand. 250 A.3d at 887–88. This "requires that plaintiffs 'make a threshold showing, through the allegation of particularized facts, that their claims have some merit.'" *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). Here, Plaintiffs argue that the Director Defendants faced a substantial likelihood of liability for misrepresenting TreeHouse's financial condition, committing insider

15

trading, and failing to exercise proper oversight. They also allege unjust enrichment and corporate waste. *See id.* The Court addresses each of these theories below.

### a.     Liability for Misrepresentations

Plaintiffs first argue that the Director Defendants face a substantial likelihood of liability for disseminating false or misleading statements about the Private Brands Acquisition or failing to correct misstatements once they were made. R. 80-1 at 12.

In the absence of a request for stockholder action, Delaware law does not require directors to provide shareholders with information concerning the finances or affairs of the corporation. *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). Nonetheless, directors have a fiduciary duty to exercise due care, good faith, and loyalty in connection with their communications with shareholders. *In Re Allergan, Inc. Stockholder Litig.*, No. CIV.A. 9609-CB, 2014 WL 5791350, at *10 (Del. Ch. Nov. 7, 2014) (citing *id.* at 10). This encompasses a duty not to "*knowingly* disseminate false information." *Id.* (emphasis in original). A breach of fiduciary duty claim premised on the allegation that a defendant knowingly misled a plaintiff sounds in fraud and therefore is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *Rogers v. Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 984 (N.D.Ill.2006), *aff'd*, 521 F.3d 702 (7th Cir. 2008).

Here, the complaint fails to allege particularized facts showing that any of the nine Director Defendants besides Reed knowingly disseminated false or materially misleading statements.

As a threshold matter, the Court assumes that allegations concerning Reed's commentary on the company's integration efforts establish that he faced a substantial

likelihood of liability for knowingly disseminating false information. In the Securities Class Action—which involved similar facts and allegations as this case—the District Court applied Rule 9(b)'s heightened pleading standard and concluded that Reed plausibly made false or misleading statements to shareholders about the Private Brands Acquisition, and that he knew the statements he made were false or misleading at the time he made them. *See Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at \*4 (N.D. Ill. Feb. 12, 2018); *see also In re TransOcean Tender Offer Sec. Litig.*, 427 F. Supp. 1211, 1219 (N.D. Ill. 1977) (applying doctrine of collateral estoppel to common issues in Delaware breach of fiduciary duty claims and federal securities fraud claims).

As to the other Director Defendants, Plaintiffs assert that they are liable for misstatements in TreeHouse's SEC filings and press releases because "each signed off on SEC filings and/or allowed Reed to repeatedly comment on the Company's integration efforts." R. 84 at 14. These allegations are insufficient to satisfy the heightened pleading standard.

None of the other Director Defendants were parties in the Securities Class Action, which focused primarily on Reed's false or misleading statements. *See generally TreeHouseFoods*, 2018 WL 844420. Plaintiffs cannot ascribe statements made or authorized by Reed to the other Director Defendants; a derivative complaint must plead "facts specific to each director." *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007); *accord Zuckerberg*, at 262 A.3d at 1059; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (rejecting the "judicial presumption that statements

17

in group-published documents are attributable to officers who have daily involvement in company operations."). Even if Reed's statements could be imputed to the Director Defendants, the complaint fails to set forth particularized facts showing that the Director Defendants had *knowledge* that the statements were false or misleading. *Barrows*, 924 A.2d at 943. ("Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes.").

Additionally, the Form 8-Ks and Form 10-Qs that TreeHouse filed with the SEC were not signed by the Director Defendants, nor are there particularized allegations that any of the Director Defendants (except for Reed) were involved in preparing these filings. And though TreeHouse's 2015 Form 10-K bears the Director Defendants' signatures, the mere fact that directors signed a document is not a sufficient basis to impute personal liability for demand pleading purposes. *See In re TrueCar, Inc. S'holder Derivative Litig.*, No. CV 2019-0672-AGB, 2020 WL 5816761, at *15 (Del. Ch. Sept. 30, 2020) (plaintiffs failed to allege particularized facts that directors who signed or approved company's 10-K had actual knowledge that the business would suffer). The complaint therefore lacks particularized facts connecting the statements in the 10-K to each of the Director Defendants.

More fundamentally, even if statements in TreeHouse's 10-K could be attributed to the Director Defendants, Plaintiffs have not alleged that the document contains any false or materially misleading statements. In their response to Defendants' motion, Plaintiffs merely point to anodyne statements like "we believe our acquisitions have been successful and consistent with strategy," "we believe we

18

have the expertise and demonstrated ability to identify and integrate value-enhancing acquisitions," and "our proven integration strategies have resulted in deleveraging." R. 1 ¶ 82 (excerpting Form 10-K). These are not actionable misstatements under Delaware law. *See, e.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, No. CIV.A. 4410-VCL, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) ("Under Delaware law, a company's optimistic statements praising its own skills, experience, and resources are mere puffery and cannot form the basis for a fraud claim.") (citation and internal quotations omitted).

Plaintiffs also argue that the Court may impute knowledge of material misstatement to the fact that five of the Director Defendants were members of TreeHouse's audit committee. *See* R. 84 at 15. But Plaintiffs' argument is "contrary to well-settled Delaware law" that membership on an audit committee, without more, is not a permissible basis upon which to infer knowledge of false statements in a company's financial statements for demand pleading purposes. *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008). The cases cited by Plaintiffs involve allegations that audit committee members specifically reviewed or authorized false or misleading statements. *See* R. 84 at 16. By contrast, here, there are no allegations that members of TreeHouse's Audit Committee specifically prepared or reviewed documents that contained false or misleading statements.

Accordingly, Plaintiffs have failed to plead particularized facts sufficient to establish that any of the Director Defendants other than Reed faced substantial likelihood of liability based on misstatements.

### b. Liability for Insider Trading

As mentioned above, Plaintiffs allege that two Director Defendants (Sardini, and Smith) sold TreeHouse stock while the price was inflated. The Court now considers whether these allegations are sufficient to state a derivative claim for insider trading.

Delaware recognizes a cause of action for insider trading, also known as a *Brophy* claim. *In re Oracle Corp.*, 867 A.2d 904, 925 (Del. Ch. 2004), *aff'd.* 872 A.2d 960 (Del. 2005) (citing *Brophy*, 70 A.2d 5). To state a *Brophy* claim, a plaintiff must allege facts indicating that (1) the corporate fiduciary possessed material, nonpublic company information, and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information. *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011). Actual harm to the corporation is not required. *Id.* Like a federal securities law claim, a *Brophy* claim requires allegations of scienter, or facts that give rise to a reasonable inference that the insiders sold stock "on the basis of and because of adverse material non-public information." *Huang*, 823 A.2d at 505. Although the complaint alleges that Sardini and Smith sold their stock after the Private Brands Acquisition and before the November 16, 2016 8-K and press release, Plaintiffs have not adequately alleged scienter. To do so, Plaintiffs must allege knowledge of material non-public information coupled with "allegations of unusually large, suspiciously timed trades." *In re Clovis Oncology, Inc. Derivative Litig.*, No. CV 2017-0222-JRS, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019). While the fact that a fiduciary sold stock at or around the time they learned of material, nonpublic information might be

evidence of improper motive, "temporal proximity alone generally is insufficient to support an inference of scienter that will survive a motion to dismiss." *Id.*

Here, there are no particularized allegations that Sardini or Smith possessed material, non-public information about the drawbacks of the Private Brands Acquisition apart from the information conveyed in the company's public filings. There are no particularized facts indicating that Sardini and Smith knew that statements in TreeHouse's public filings were false or misleading when they sold their stock. *See Huang,* 823 A.2d at 502 ("[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.").

Plaintiffs suggest that the Director Defendants' knowledge of TreeHouse's "core operations" demonstrates that they were aware that the Private Brands Acquisition was not performing up to par. R. 84 at 14–15. But these allegations are asserted against the Director Defendants as a whole and are not specific to Sardini and Smith. *Zuckerberg*, 262 A.3d at 1059. On top of that, the sole case that Plaintiffs cite for this theory *rejected* the plaintiff's allegations of scienter because the defendants' knowledge of a disputed tax position did not entail that they disbelieved statements made in the corporation's public filings or sought to deceive investors. *See Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018). Similarly, the mere fact that Sardini and

21

Smith had access to TreeHouse's financial statements does not plausibly show that they disbelieved the statements in the SEC filings or accompanying press releases.

Not only does the complaint fail to allege that Sardini and Smith possessed information that the Private Brands Acquisition was performing poorly prior to selling their stock, it is devoid of allegations that the trades were unusually large or suspiciously timed. *Clovis*, 2019 WL 4850188, at *15. Neither Sardini nor Smith sold a majority of their TreeHouse stock. *Huang*, 823 A.2d at 503 n. 20 (finding that the fact that defendant retained the bulk of his shares cuts against inference of scienter). The complaint contains "no particularized allegations of these Defendants' trading activities before or after the relevant period from which it could be inferred that their trading activities were unusual for that period." *Kernaghan v. Franklin*, No. 06 C 1533, 2008 WL 4450268, at *6 (S.D.N.Y. Sept. 29, 2008). Finally, there are no allegations that the sales were made outside of permitted trading periods, or that they were made on the basis of specific misstatements. *See id.*

Because the complaint does not allege particularized facts that give rise to an inference of scienter, Sardini and Smith do not face a substantial likelihood of liability for a *Brophy* insider trading claim. Furthermore, even if the allegations were sufficient to state a *Brophy* claim, they would be insufficient to establish a substantial likelihood of liability for *a majority* of the Director Defendants. *See In re Kraft Heinz S'holder Derivative Litig.*, No. 20 C 2259, 2023 WL 2745118, at *9 (N.D. Ill. Mar. 31, 2023) (declining to consider *Brophy* claims against three board members who sold

company stock because the allegations, even if accepted as true, would have been insufficient to establish demand futility).

### c. Liability for Oversight Failure (*Caremark*)

Plaintiffs also allege that the Director Defendants face a substantial likelihood of liability based on their failure to implement adequate controls or oversee TreeHouse's operations. R. 1 ¶ 152. "A claim for breach of the duty of oversight is known colloquially as a *Caremark* claim." *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 674 (Del. Ch. 2023) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)). Because "most of the decisions that a corporation acting through its human agents makes are . . . not the subject of director attention," a *Caremark* claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006).

A *Caremark* claim requires allegations that directors either (1) "utterly failed to implement any reporting or information controls," or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations." *Id.* at 371. The Delaware Chancery Court has referred to the first type of claim as an "information systems" claim and the second type of claim as a "red flags" claim. *McDonalds*, 291 A.3d at 676. For either claim, director liability requires a showing of bad faith. *Id.* (citing *Huang*, 823 A.2d at 506).

Plaintiffs' allegations are insufficient to establish that the Director Defendants face a substantial likelihood of liability under either prong of *Caremark*. First, Plaintiffs do not plausibly allege an information systems claim based on a failure to

establish reporting or information controls. The complaint does not allege, for example, "that the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet." *Oakland Cnty.*, 772 F. Supp. 2d at 977 (citation omitted). Indeed, the complaint concedes that the company had an audit committee in place to detect errors in the company's financial statements. Additionally, TreeHouse's "Code of Ethics" (excerpted at length in the complaint) demonstrates that TreeHouse had procedures in place to prevent the falsification of records, protect company assets, avoid conflicts of interest, and prevent insider trading. R. 1 ¶¶ 68–69. While the mere presence of these controls does not immunize the Director Defendants from liability, it short-circuits the argument that no controls were in place.[3] *See Stone*, 911 A.2d (rejecting information systems claim based on concession that reporting system existed); *cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("[N]o system is so foolproof that it cannot be evaded.").

Plaintiffs also fail to establish a substantial likelihood of liability for a red flags claim under *Caremark's* second prong. To allege a red flags claim, a plaintiff "must plead particularized facts that the board knew of evidence of corporate misconduct— the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *McDonalds*, 291 A.3d at 677. The complaint is devoid of particularized allegations that the Director Defendants were aware of, and ignored, corporate wrongdoing. The complaint simply repeats the refrain that each defendant

---

[3] While Plaintiffs allege that the Director Defendants violated the Code of Ethics, these allegations are entirely conclusory. *See* R. 1 ¶ 137.

"conducted little, if any oversight." R. 1 ¶¶ 127–135. "Conclusory allegations" that fiduciaries "consciously ignored . . . warning signs or knowingly failed to monitor the company's risk" are insufficient to state a *Caremark* claim. *Citigroup*, 964 A.3d at 127.

Plaintiffs suggest that the "persistent dissemination of materially false and misleading statements" demonstrates that the Director Defendants failed to monitor key risks. R. 84 at 17. But there are no allegations about *how* or *when* the Director Defendants obtained knowledge that these statements were false or misleading. Plaintiffs simply assume that the Director Defendants were on notice of deficiencies without alleging any "red flags." This is insufficient. *See Oakland Cnty. Emps.' Ret. Sys. v. Massaro*, 772 F. Supp. 2d 973, 978 (N.D. Ill. 2011) (holding that conclusory allegations that defendants failed to exercise oversight were inadequate to state a red flags claim). In sum, Plaintiffs fail to establish a substantial likelihood of liability on a *Caremark* claim for any of the Director Defendants.

### d.    Liability for Other Common Law Claims

Plaintiffs also contend that the Director Defendants face a substantial likelihood of liability for other common law claims, including unjust enrichment, corporate waste, gross mismanagement, and abuse of control. R.1. The Court briefly addresses each of these claims, beginning with the unjust enrichment claim.

Under Delaware law, an unjust enrichment claim requires: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law. *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998). Plaintiffs allege

25

that the Director Defendants "either benefitted financially from the improper conduct, received proceeds from insider sales, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation." R. 1 ¶ 158.

These allegations are insufficient to establish a substantial likelihood of liability. Again, Plaintiffs fail to make particularized allegations on a per-director basis. *Zuckerberg*, 262 A.3d at 1059. Plaintiffs' unjust enrichment claim merely rehashes the same facts set forth in support of their breach of fiduciary duty claims. *In re MetLife Inc. Derivative Litig.*, No. CV 2019-0452-SG, 2020 WL 4746635, at *18 (Del. Ch. Aug. 17, 2020) (holding that, in circumstances where an unjust enrichment claim is based on failure of oversight, it is not a separate claim, but is "a form of additional damages dependent on the plaintiff proving the oversight claim"); *In re Camping World Holdings, Inc. Stockholder Derivative Litig.*, No. 2019-0179-LWW 2022 WL 288152 at *7 n.83 (Del. Ch. Jan 31. 2022) (same for *Brophy* claims). Finally, as stated above, conclusory allegations concerning directors' compensation are insufficient to establish a likelihood of liability absent particularized allegations that the compensation was disproportionate or linked to the challenged conduct. *InfoUSA*, 953 A.2d at 983. Plaintiffs' allegations lack the factual particularity necessary to establish a substantial likelihood of liability under Rule 23.1.

Plaintiffs similarly fail to establish a substantial likelihood of liability for corporate waste. To state a claim for corporate waste, a plaintiff "must allege facts showing that no person of ordinary sound business judgment could view the benefits

26

received in the transaction as a fair exchange for the consideration paid by the corporation." *Tornetta v. Musk*, 250 A.3d 793, 814 (Del. Ch. 2019) (citation omitted). The test for corporate waste is "stringent;" if "any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008) (citation omitted). While the Private Brands Acquisition may have been a raw deal for TreeHouse's shareholders, it was not the sort of unconscionable misstep that constitutes corporate waste. Because Plaintiffs have failed to plead particularized facts showing that the Private Brands Acquisition was egregious or irrational, they have failed to establish a substantial likelihood of liability for corporate waste. *See In re Caterpillar Inc.*, No. 113 C 01104, 2016 WL 5660370, at *10 (C.D. Ill. Sept. 29, 2016).

Lastly, Plaintiffs assert claims for "gross mismanagement" and "abuse of control." But Delaware law does not recognize an independent cause of action against corporate directors for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 115 n.6 (Del. Ch. 2009). Defendants are correct that these are merely *Caremark* claims by another name. *See Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004) (holding that state law claims for abuse of control and gross mismanagement were "premised on the defendants' alleged breach of their fiduciary duties"). Plaintiffs have failed to allege a substantial likelihood of liability for these claims. Accordingly,

27

Plaintiffs fail to establish that any of the Director Defendants besides Reed faced a substantial likelihood of liability for any of the causes of action in the complaint.

### 3. Independence

The third and final prong of the *Zuckerberg* test considers whether Plaintiffs have alleged that any of the Director Defendants are not independent of other directors who were either interested in the transaction or faced a substantial likelihood of liability. Because only Reed, Sardini, and Smith potentially face a substantial likelihood of liability, the Court considers whether the other Director Defendants were independent of these directors. The court must apply a "subjective standard" and determine whether the director in question had "ties [that] were *material*, in the sense that the alleged ties could have affected the[ir] impartiality." *Zuckerberg*, 262 A.3d at 1061. To establish lack of independence, the ties must be of a "bias-producing nature." *Id.* "Personal friendships" and outside "business relationships" are "insufficient to raise a reasonable doubt" that a director lacked independence. *Id.* (quoting *Beam*, 845 A.2d at 1050).

To establish that the Director Defendants were not independent, the complaint merely asserts in conclusory fashion that the Director Defendants "have longstanding business and personal relationships with each other…that preclude them from acting independently." R. 1 ¶ 138. The complaint also alleges that the Directors are "beholden" to each other because they collectively make decisions on hiring and board

membership and the individual directors may fear retaliation by one of the board's committees if they were to consider a demand. *Id.* ¶ 136.

These allegations lack the factual particularity required to establish lack of independence under Rule 23.1(b) and Delaware law. In *Zuckerberg*, the Delaware Supreme Court found that board members who owned companies that were customers of Facebook, whose venture capital funds "got good deal flow" from Facebook, and who were personal friends with Facebook's founder, Mark Zuckerberg, were independent for the purposes of the Rule 23.1 analysis. *Id.* at 1061–63. The allegations here are much sparser and more conclusory than the allegations in *Zuckerberg*. Notably, there are no allegations that any of the Director Defendants felt beholden to Reed specifically. And as to Plaintiffs' suggestion that certain Director Defendants would feel constrained based on the board's ability to control hiring decisions, for the purposes of the independence inquiry "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome" of the challenged conduct. *Aronson*, 473 A.2d at 816. Plaintiffs have failed to adequately plead that a majority of the Director Defendants lack independence.

\* \* \* \*

All in all, Plaintiffs fail to plausibly allege that a majority of the Director Defendants received a personal benefit from the alleged misconduct, faced a substantial likelihood of personal liability on any claims, or lacked independence from board members who received a benefit or faced liability. Because the complaint fails to comply with Rule 23.1's demand futility requirement, Plaintiffs claims are dismissed. Since the complaint fails to satisfy Rule 23.1, the Court does not address

Defendants' arguments regarding failure to allege derivative harm or failure to state a claim under Rule 12(b)(6). *See, e.g.*, *In re Danaher Corp. S'holder Derivative Litig.*, 549 F. Supp. 3d 59, 75 n.11 (D.D.C. 2021) (declining to consider Rule 12(b)(6) arguments following dismissal for failure to allege demand futility).

## II. Leave to Amend

Finally, the Court addresses Plaintiffs' request for leave to amend their complaint. R. 84 at 22–23. Federal Rule of Civil Procedure 15 provides that "a party may amend its pleading once as a matter of course," otherwise they must have consent from the opposing party or leave from the Court. Fed. R. Civ. P. 15(b). Leave to amend shall be freely given absent undue delay or prejudice to the opposing party. *Id*. However, a complaint should be dismissed with prejudice if an amendment would be futile. *Villars v. Kubiatowski*, 128 F. Supp. 3d 1039, 1043 (N.D. Ill. 2015) (citing *Moore v. Ind.*, 999 F.2d 1125, 1128 (7th Cir. 1993)). Because Plaintiffs have not yet filed an amended complaint and futility is not apparent from the face of the complaint, it is appropriate to give them an opportunity to amend. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss.").

**CONCLUSION**

The Defendants' motion to dismiss, R. 79, is granted. Plaintiffs' claims are dismissed due to failure to comply with Federal Rule of Civil Procedure 23.1. Plaintiffs have 28 days to file an amended complaint if they can do so consistent with the Federal Rules of Civil Procedure.

Date: <u>11/1/2023</u>

JEREMY C. DANIEL
United States District Judge